**BARNOSKY OILS, INC.,**
**Plaintiff-Appellant,**

v.

**UNION OIL COMPANY OF CALIFOR-**
**NIA, Defendant-Appellee.**

No. 79–1125.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 4, 1980.

Decided Nov. 24, 1981.

Irving I. Saul, Dayton, Ohio, Clint L. Pierson, Jr., Covington, La., for plaintiff-appellant.

John A. Krsul, Jr., Philip M. Frost, Dickinson, Wright, McKean, Cudlip & Moon, Thomas Zimmer, Detroit, Mich., for defendant-appellee.

Before BROWN and MARTIN, Circuit Judges, and SPEIGEL,* District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Barnosky Oils, Inc. appeals a judgment granting dismissal of its complaint alleging violations of federal and state antitrust laws.

The defendant below, Union Oil Company, is a major oil company engaged in the refining and marketing of petroleum products. It distributes products to the retail outlets that it serves directly, known as direct-served dealers, as well as to independent wholesalers, known as jobbers. The jobbers in turn distribute the products to retail outlets, or "jobber-served dealers." Barnosky is a Union jobber in the Metropolitan Detroit area.[1] Count One of the complaint alleges that Union exercised its control over the use of its brands, trade names and trademarks to facilitate a horizontal customer and territorial allocation in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[2] Count Two alleges that Union

also violated section 1 of the Sherman Act by requiring Barnosky to cease selling gasoline to a customer that discounted gasoline at the retail level. Count Three of the complaint alleges that Union imposed exclusive dealing arrangements on its direct-served dealers, in violation of section 1 of the Sherman Act and section 3 of the Clayton Act, 15 U.S.C. § 14.[3] Count Four alleges price discrimination in violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).[4] Finally, Count Five alleges that Union's conduct also violated the Michigan antitrust laws,[5] which parallel federal law.

Count One of Barnosky's complaint alleges that Union engaged in horizontal customer and territorial allocations throughout its Eastern Sales Region, including the metropolitan Detroit area. The combined effect of two agreements that Union demanded of its jobbers allegedly restrained Barnosky's trade. The Jobber Sales Agreement, which is the basic supply agreement, provides that the buyer: 1) may not display Union's name without its consent; and 2) must sell all Union products using Union's brands, trade names, and trademarks. The second contract is the

---

* Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

1. Barnosky distributes Union products in the Michigan counties of Wayne, Oakland, Macomb, Washtenaw, and Monroe.

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides, in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

3. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides, in pertinent part:
   It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... for use, consumption, or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such

lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

4. Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), provides in pertinent part:
   It shall be unlawful for any person engaged in commerce, in the course of such commerce either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

5. M.S.A. §§ 28.31–39, 28.348, 28.51–55, 28.825–26 [M.C.L.A. §§ 445.701–445.712, 750.151, 445.-731–445.736, 750.557, 750.558].

Loan Agreement-Signs and Related Equipment. Pursuant to this agreement Union lends its jobbers large signs which identify a retailer as a Union station. The jobbers in turn authorize the dealers they serve to display the Union signs. The most important of the signs is the sign pole—a large sphere bearing either the phrase "Union 76" or the number "76." The sign sits on top of a tall pole. Barnosky alleges that Union reserved exclusive authority over sign-pole placement at all Union retail outlets by reserving to itself in the Loan Agreement the right to remove the sign poles from jobber-served outlets. Barnosky contends that, under the agreement, it may provide signs to its customers only with Union's permission. Union essentially admits this fact in the affidavit of Robert Koch, sales manager of Union's Detroit Division.

Barnosky further alleges that Union has maintained this control in order to preclude competition between Barnosky's customers and the retail outlets that Union supplies directly. It claims that without the sign pole, a retail station is effectively "unbranded" and is therefore less able to attract customers.[6] According to the complaint, Union's control of the sign pole facilitates Union's control over the number, identity, and location of the dealers to whom Barnosky will sell gasoline. Barnosky claims that the resulting dimunition in intrabrand competition caused it to lose sales of more than 70 million gallons of gasoline during the period of time in question. Because Union also serves dealers directly, Barnosky claims that the alleged restraint is horizontal, and therefore constitutes a per se violation of the Sherman Act under *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1975).

The District Court held that Barnosky failed to allege facts sufficient to state a claim under section 1 of the Sherman Act. It observed that Barnosky failed to allege that Union acted in concert with any other party or entity and that Barnosky expressly denied such an allegation during the oral argument on Union's motion. In the court's view, Union's alleged acts were unilateral. The court further held, citing *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1973), that Union's conduct could not amount to an unreasonable restraint of trade. For these reasons, the court concluded that Barnosky failed to state a cause of action under section 1, and that Count One should therefore be dismissed.[7] Because we agree that Barnosky failed to allege that Union engaged in concerted activity, we affirm the dismissal of this count of the complaint.

Accepting the allegations of the complaint as true, *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), we assume that Union controlled the placement of the sign poles bearing its trade names and trademarks in order to allocate territories among itself and Union jobbers. Section 1 of the Sherman Act does not proscribe every act that restrains trade. Rather, it outlaws concerted activity by two or more persons; it expressly requires a "contract, combination . . . or conspiracy in restraint of trade." The classic example of concerted action is an agreement among competitors to engage in a common course of conduct. However, it is clear that the combination requirement of section 1 is not confined to such agreements.

---

**6.** Union has in all instances given jobbers authorization to permit jobber-served dealers to use Union's brand names on the pumps which distribute Union gasoline for resale. At issue here is Union's refusal to authorize the placement of sign-poles at certain outlets. Barnosky identified 5 locations for which Union, during the period from 1969 through 1977, withheld or denied authorization to Barnosky to use Union signs to identify those locations as Union branded stations. In addition, Union imposed upon itself and all of its jobbers a moratorium

against authorization to use Union signs to identify new locations from February 4, 1977 until February 24, 1978.

**7.** Union did not move for dismissal of Count I; rather, it moved for summary judgment on Counts I and III. There is nothing inherently erroneous in dismissing a count for failure to state a claim even though such a defense was not raised. *See Wright & Miller*, 5 Federal Practice and Procedure § 1347 at 535, § 1357 at 593 (1969).

Barnosky relies on *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), to support its contention that it alleged sufficient joint conduct to support a section 1 claim. *Albrecht* was a newspaper carrier for the defendant Herald Company. All carriers had exclusive territories. These were subject to termination if prices exceeded Herald's advertised suggested maximum price. After adhering to the suggested price for some time, Albrecht raised his price. Herald responded by notifying him that it would offer the paper to subscribers on his route at the lower price. Herald also hired a circulation company to solicit customers along Albrecht's route. Three hundred of Albrecht's twelve hundred customers switched to direct delivery by Herald. These customers were turned over to another carrier, George Kroner, who took over the route knowing that he might have to return it if Albrecht lowered his price. Herald continued to sell newspapers to Albrecht, but threatened to terminate his appointment as a carrier if he continued to overcharge.

Albrecht sued, charging a combination in restraint of trade between Herald, Albrecht's customers, the circulation company, and Kroner. The jury found for Herald. Albrecht moved for a judgment notwithstanding the verdict on the ground that the undisputed facts showed as a matter of law a combination to fix resale prices. The motion was denied, and judgment was entered on the verdict. The Eighth Circuit affirmed, but the Supreme Court reversed. Citing *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Court stated that Herald, the circulation company, and Kroner had combined to force Albrecht to conform to the advertised retail price. 390 U.S. at 149, 88 S.Ct. at 871. In a footnote the Court also stated that "[u]nder *Parke, Davis* [Albrecht] could have claimed a combination between

[Herald] and himself, at least as of the day he unwillingly complied with [Herald's] advertised price." *Id.* at 150, n.6, 88 S.Ct. at 872. *See also Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed 982 (1968).

Barnosky contends that the requisite joint action is established in this case because it was forced to comply with a contractual arrangement giving Union exclusive control over the placement of Union signs. We disagree, and hold that the rationale of *Albrecht* and *Parke, Davis* does not apply to these facts.

*Albrecht's* theory of combination requires a finding that the antitrust plaintiff was coercively induced to participate in the alleged illegal activity. "We made clear in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive device is." *Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964). *See also Perma Life Mufflers, supra*, at 142, 88 S.Ct. at 1986.[8] The facts alleged by Barnosky preclude a finding that Union engaged in any coercive conduct or that Barnosky in any way participated in the alleged territorial allocation. By controlling the placement of its signs, Union was merely exercising its right to limit the use of its trade names and trademarks by its customers. Indeed, Union must exercise this control or risk losing its trademark protection. *See, e. g. Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (C.C.P.A.1978); *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.—East*, 542 F.2d 1053, 1059 (9th Cir. 1976), *cert. denied*, 443 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). In its brief, Barnosky emphasizes the fact that Union's control over sign post placement is evident from the Jobber Sales Agreement and the

---

**8.** For further discussion, see *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1032 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979):

"The *Albrecht* finding of an unlawful combination has been read in this circuit to apply only where there is evidence of knowing and active participation by a dealer and his manufacturer in a scheme to coerce compliance with anticompetitive activity such as resale price maintenance."

Loan Agreement, and that Union referred to those documents in exercising that authority. Those facts are not relevant, because Barnosky did not participate in allocating that authority to Union. Barnosky's claim that it unwillingly acquiesced in Union's control over sign placement, and thus participated in a combination, is without merit. Barnosky alleged no facts indicating that its acquiescence in Union's control was needed, sought, or given. *See Quigley v. Exxon Company, U.S.A.*, 376 F.Supp. 342, 350 (M.D.Pa.1974). Thus, the facts alleged here "do not fall within any recognized or logical theory of combination." *Id.*

The Third Circuit discussed the indicia of combination in *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3rd Cir. 1975). Holiday Inns, Inc., the owner of a trademark, both licensed its trademark to franchisees wishing to operate Holiday Inns at specified sites, and owned and managed a number of inns as well. The case arose out of Holiday Inns' denial of a franchise application for a Holiday Inn near the Newark, New Jersey airport. The applicant was American Motor Inns, Inc., which at the time was Holiday Inns' largest franchisee, operating 48 hotels. The District Court found that Holiday Inns engaged in the following practices in making its franchising decisions: (1) it employed a "radius letter" procedure upon receiving an application for a franchise, sending letters to the three Holiday Inns nearest the proposed location, inviting those franchisees to comment on the application; (2) it maintained a "company-town" policy by generally refusing to grant franchises in 152 cities in which Holiday Inns, Inc. operated its own hotels; and (3) it prohibited franchisees, through a "non-Holiday Inn clause" in the franchise agreement, from directly or indirectly owning or operating any hotel or motel which was not a Holiday Inn. The District Court concluded that the combined effect of the radius letter procedure, the company-town policy, and the non-Holiday Inn clause was a horizontal allocation of territories which is per se illegal. 365 F.Supp. 1073 (D.N.J.1973). It expressly stated, however, that the company-town policy, standing alone, could not constitute a violation of section 1 of the Sherman Act. It had been argued that American Motor Inns' repeated acquiescence in Holiday Inns' refusal to grant franchises in parent company towns established a combination and conspiracy between the two to allocate markets horizontally. The District Court rejected that argument:

I find it impossible to apply the rationale of *Albrecht* and *Parke, Davis* to the instant situation. In both of those cases, the coerced parties could have acted differently; they could have maintained their prices at a non-price-fixed level. It took the coercing and coerced parties acting together to fix the prices. However, here AMI could not have taken it upon itself to build a Holiday Inn even if HI had no parent company town policy. Entering a franchising system is not analogous to setting one's own prices. HI has merely exercised a unilateral power to deny franchise applications. Hence, there can be no combination or conspiracy.

Nor is there involved a contract in restraint of trade; the parent company town policy cannot be found explicitly or implicitly in the franchise agreement. In both [*Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.1969), *aff'd per curiam*, 417 F.2d 621 (2d Cir. 1969)] and [*Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir. 1973)], on the other hand, the condemned territorial allocations were found on the face of the agreements signed by the manufacturers with their respective distributors. Standing alone, therefore, the parent company town policy, restrictive of competition though it is, may not violate Section 1 of the Sherman Act.

*Id.* at 1093.

Although the Third Circuit approved this finding, it nevertheless held that a combination or conspiracy existed. The court stated:

The combination of the company-town policy and the non-Holiday Inn clause, however, does create a basis for finding a

horizontal conspiracy between HI, operating on the retail level as a motel-operator, and HI's franchisees. For example, the district court found that the "company-town policy standing alone prevents AMI from building a Holiday Inn in competition with the company-owned inns in Forth Worth. The non-Holiday Inn clause also prevents AMI from building a Sheraton Inn in Fort Worth." The net result of the two practices is that HI and its franchisees have agreed to a division of territories.

The district court concluded that the company-town policy, standing alone, would be satisfactory because, although it resulted in an allocation of territories, it was imposed unilaterally by HI. When the company-town policy is joined with the non-Holiday Inn clause, however, the element of "contract, combination or conspiracy" is fulfilled by the presence of the non-Holiday Inn clause in the franchise agreement, whether or not the non-Holiday Inn clause alone is valid.

521 F.2d at 1253.

The conduct Barnosky objects to does not differ in principle from the company-town policy in *American Motor Inns*. Barnosky alleges that Union denied requests for station signs in order to preclude competition with the stations to which Union itself wholesales. There is no allegation that Union collaborated with other wholesalers or with retailers in denying those requests. Nor is there any allegation of a restriction analogous to the non-Holiday Inn clause in *American Motor Inns*. Barnosky is apparently free to wholesale other brands of gasoline, and may attempt to sell to stations in competition with Union's direct-served dealers.[9]

In our view, Union has merely exercised its unilateral power to deny requests for signs and related equipment.[10] Although Union's exercise of that power may restrict competition to an unknown extent, this cannot constitute a violation of section 1 of the Sherman Act. We therefore affirm the District Court's dismissal of Count One of the complaint.

Count Two of the complaint alleges that Union coerced Barnosky to terminate its sales of Union gasoline to Maverick Oil Company. Maverick was a Union branded retailer with three outlets in the Detroit area. It began to deal with Barnosky in 1970, and in 1971 purchased roughly seven million of the twenty-two million gallons of gasoline Barnosky obtained from Union. This latter amount greatly exceeded the two and one-quarter million gallon annual maximum provided for in the contract then in effect between Barnosky and Union.

Barnosky claims that Maverick was selling gas for approximately two cent less per gallon than the average Union retail outlet in the Detroit area. Barnosky alleges that this practice created a price war damaging to the business of other retailers, causing many of Union's direct-served dealers and other jobbers to complain to Union about Maverick. Barnosky claims that Union threatened to enforce the contractual maximum of two and one-quarter million gallons if Barnosky continued selling to Maverick, and offered to raise the maximum allocation to fifteen million gallons if Maverick was cut off. Barnosky accepted this offer, stopped supplying Maverick, and entered into a new contract with Union on October

---

9. The Jobber Sales Agreement dated October 4, 1976 does, however, require Barnosky to purchase at least 60% of its requirements for the respective products listed.

10. The fact that Union sells gasoline directly to retailers as well as to jobbers has no bearing on the joint conduct issue. The characterization of restraints imposed by manufacturers in such a "dual distribution" scheme is a matter of substantial debate. *Compare American Motor Inns, Inc. v. Holiday Inns, Inc., supra, Hobart Bros. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir.), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973), and *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.), *aff'd per curiam*, 417 F.2d 621 (2d Cir. 1969), with *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981). *See also Donald B. Rice Tire Co., Inc. v. Michelin Tire Corp.*, 638 F.2d 15 (4th Cir. 1981). In the absence of concerted activity, however, the characterization question is purely hypothetical. We therefore do not address it.

22, 1971 for a maximum of fifteen million gallons per year. Barnosky contends that Union's conduct in obtaining this agreement amounts to indirect price fixing in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

The District Court found that this count of the complaint was barred by the four-year statute of limitations provided by section 4(b) of the Clayton Act, 15 U.S.C. § 15(b).[11] It rejected Barnosky's arguments that (1) Union committed a continuous antitrust violation; and (2) the claim falls within the speculative damages exception to the statute of limitations announced in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). We agree with the District Court.

When a continuous antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants. *Id.* at 338, 91 S.Ct. at 806. Barnosky contends that Union's conduct was continuous in the following respects: Union repeatedly enforced the agreement to cut off Maverick by maintaining its sign-pole policy, precluding Barnosky from re-branding Maverick without Union's permission; Union could have ceased causing the injury at any time; and Union gained lasting freedom from Maverick's downward pressure on price. Barnosky relies on two Fifth Circuit cases, *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), and *Imperial Point Colonnades Condominium, Inc. v. Manguriam*, 549 F.2d 1029 (5th Cir. 1977), *cert. denied sub. nom., Manguriam v. Thompson*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), to support its contention that Count Two alleges a continuing violation. Its reliance on these cases is misplaced, and the undisputed facts of this case preclude a finding of such a violation.

In *Poster Exchange*, the Fifth Circuit dealt with an alleged conspiracy among the defendants to refuse to deal with the plaintiffs. The defendants had stopped dealing with the plaintiffs in 1961, and the suit was filed in 1969. The District Court granted summary judgment for the defendants because the statute of limitations had run. The Fifth Circuit reversed and remanded, holding that the plaintiff could maintain the action if it could show that "there had been a specific act or word of refusal during the limitations period." 517 F.2d at 129. The court drew a critical distinction between the mere absence of dealing and an actual reiteration of the defendants' refusal to deal: "It remains clear ... that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Id.* at 128.

Although Barnosky asserts that Union continually enforced the 1971 agreement, it is undisputed that Barnosky never requested permission to sell gasoline to Maverick during the limitations period.

In *Imperial Point Colonnades*, purchasers of condominiums were required as a condition of the purchase to enter a ninety-nine-year lease of recreational facilities. They filed a suit more than four years after they purchased the condominiums and executed the lease, alleging a conspiracy to restrain trade by means of an unlawful tying arrangement. The Fifth Circuit concluded that each collection of rent under the lease gave rise to a new cause of action. 549 F.2d at 1043. Barnosky argues that the benefits Union obtained from Maverick's termination are analogous to the rent collections in *Imperial Point Colonnades*. As the District Court pointed out, however, that case expressly reaffirms the rule "that plaintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit." *Id.* at 1044. The act alleged in Count Two is Union's coercion in

11. Barnosky's complaint was filed May 12, 1977; on February 8, 1978, the complaint was amended to include this claim. The District Court held, and we agree, that the claim is barred even if the amendment relates back to the filing of the complaint.

1971 which caused Barnosky to terminate Maverick. That Barnosky may have suffered, and Union may have benefitted, from the consequences of Union's conduct during the limitations period does not render the act a continuing violation of the antitrust laws. *Fontana Aviation, Inc. v. Baldinelli*, 418 F.Supp. 464, 468 (W.D.Mich.1976), *aff'd per curiam*, 575 F.2d 1194 (6th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 281, 58 L.Ed.2d 257 (1978). The 'unabated inertial consequences' of the 1971 contract are qualitatively distinct from the acts that gave rise to continually accruing causes of action in *Imperial Point Colonnades* and its predecessors. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Baker v. F & F Investment*, 420 F.2d 1191 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975). Union committed no act within the relevant four-year period that would constitute the continuous antitrust violation alleged in Count Two.

■ We also agree with the District Court that the speculative damage exception to the antitrust statute of limitations, set forth in *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, is not available to Barnosky with respect to Count Two. In *Zenith*, the Supreme Court stated:

> [E]ach separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. See, e. g., *Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc.*, 153 F.Supp. 589, 593 (D.C.N.J.1957); *Momand v. Universal Film Exchange, Inc., supra*, 43 F.Supp. at 1006. Cf. *Lawlor v. Loewe*, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341, 349 (1915). Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date

and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action. On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. *Moe Light, Inc. v. Foreman*, 238 F.2d 817, 818 (C.A.6 1956); *Chicago & N. W. R. Co. v. DeClow*, 124 F. 142, 143 (C.A.8 1903); *Culley v. Pennsylvania R. Co.*, 244 F.Supp. 710, 715 (D.C.Del.1965). Cf. *Howard v. Stillwell & Bierce Mfg. Co.*, 139 U.S. 199, 206, 11 S.Ct. 500, 35 L.Ed. 147, 150 (1891).

In antitrust and treble damages actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. Cf. *Schenley Industries v. N. J. Wine & Spirit Wholesalers Association*, 272 F.Supp. 872, 887–888 (D.C.N.J. 1967); *Delta Theaters, Inc. v. Paramount Pictures, Inc., supra*, 158 F.Supp. at 648–649. Otherwise future damages which could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve "as a bulwark of antitrust enforcement" and that the antitrust laws fully "protect the victims of the forbidden practices as well as the public." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 20 L.Ed.2d 982, 990, 88 S.Ct. 1981 (1968); *Radovich v. National Football League*, 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456, 463 (1957). See also *Lawlor v. Na-*

*tional Screen Serv. Corp.*, 349 U.S. 322, 329, 99 L.Ed. 1122, 1128, 75 S.Ct. 865 (1955).

401 U.S. 338–40, 91 S.Ct. at 806–07.

■ Thus, Barnosky may pursue an action for damages flowing from the 1971 contract that it sustained at any time within four years of the date it filed suit, only if those damages were speculative, uncertain or otherwise incapable of proof on February 8, 1974. Whether a plaintiff has to show that the damages were speculative for the entire four years after the violation or merely at the moment of the violation is not clear from the Court's language in *Zenith*. *See* Wheeler & Jones, *The Statute of Limitations for Antitrust Damage Actions: Four Years or Forty?*, 41 U.Chi.L.Rev. 72, 75 (1973). This court has not definitively answered that question because language supporting either interpretation of *Zenith* appears in *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233, 234 (6th Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974). We need not decide which interpretation to follow in this case, for Barnosky's claim must fail under either. At the time of the alleged violation, Barnosky had established a history of dealing with Maverick, from which it could have projected future damages. The onset of the Arab Oil Embargo and the resulting allocation regulations created uncertain market conditions which certainly would have affected those calculations, had Barnosky brought suit during that period of time. However, it is well settled that mere uncertainty as to the extent or amount of damages will not bar recovery under the antitrust laws. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). We agree with the District Court that at the time of the alleged violation and during the following four years a jury could have been permitted to "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Thus, Barnosky's second count is barred by the statute of limitations.

In Count Four of the amended complaint, Barnosky alleges that Union violated section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), by engaging in unlawful price discrimination. The facts underlying this claim are simple. Union sells gasoline to Union jobbers at lower prices than it charges its direct-served dealers. On May 14, 1973, Union narrowed this price differential by 0.4 cents per gallon, by raising the prices it charged the jobbers without raising the prices it charged its own retailers. Barnosky claims that it passed this price increase through to its dealers, who therefore paid a higher price for gasoline than did Union's direct-served dealers. Barnosky contends that Union has therefore engaged in price discrimination between its direct-served dealers and those dealers served by Barnosky.

■■ A party alleging price discrimination under the Robinson-Patman Act must prove that the same seller charged different prices to different purchasers. Barnosky's purchasers did not purchase their gasoline from Union. However, Barnosky asserts that the indirect purchaser doctrine requires us to regard Barnosky's customers as Union's direct customers for the purposes of the Robinson-Patman Act. The indirect purchaser doctrine was described succinctly by the Seventh Circuit in *Purolator Products, Inc. v. FTC*, 352 F.2d 874 (7th Cir. 1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968):

> To ensure fair competition among purchasers from the same seller, the Robinson-Patman Act amendments to the Clayton Act forbade sellers to make price discriminations between purchasers except when justified by economies to the seller. If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical, economic purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale

84

price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competition. *American News Company v. F.T.C.*, [300 F.2d 104 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962)].

*Id.* at 883. This circuit has approved the doctrine, and has stated that the critical factor in determining its applicability is the degree of control exercised by the seller over its immediate buyer. *Brewer v. Uniroyal Tire, Inc.*, 498 F.2d 973, 977 n.2 (6th Cir. 1974).

In our view, Barnosky has failed to allege facts that would support a finding that Union exercises sufficient control over Barnosky to invoke the indirect purchaser doctrine. There is no allegation that Union set or controlled Barnosky's resale price. The only element of "control" present in this case is remote at best: as a practical matter, Union's wholesale price to its jobbers serves as a floor to their resale prices. *See FLM Collision Parts, Inc. v. Ford Motor Company*, 543 F.2d 1019, 1028 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Were we to equate this with control we "would reach the absurd result of extending the doctrine to cover every resale of goods." *Id.* The direct contacts between Union and Barnosky's retail customers provide business training and advertising materials. Barnosky does not allege that Union representatives either solicited or took orders for gasoline. Their activities served merely to enhance Union's overall market position on a regional or national level. Those contacts therefore do not establish that Union controlled the resale of gasoline by Barnosky. *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 7 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969).

Other indicia of control alleged by Barnosky are also insufficient to establish control. The requirement that jobbers resell Union gasoline under proper brands, trade names, and trademarks merely restates the brand-

ing requirements established by Michigan law. *See* M.S.A. § 28.526 [M.C.L.A. § 752.-256]. Finally, the fact that Union assigned to Barnosky five of the latter's resale contracts simply has no bearing on the question whether Union controlled the sales of gasoline Barnosky made pursuant to those or other resale contracts.

The purpose of the indirect doctrine is to prevent a manufacturer from insulating itself from Robinson-Patman liability by using a "dummy" wholesaler to make sales at terms actually controlled by the manufacturer. *See American News Co. v. F.T.C.*, 300 F.2d 104, 109–10 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). We note that in arguing the other claims in this case, Barnosky has characterized itself as an active competitor of Union to the extent that Union sells gasoline directly to retailers. We do not hold that those claims and this price discrimination allegation are mutually exclusive. The indirect purchaser doctrine normally raises a factual issue not properly resolved prior to trial. However, it is clear to us that Barnosky is not a dummy wholesaler. Thus, in these circumstances we conclude that even if Barnosky's allegations are true, its resale customers cannot be deemed to have purchased from Union for the purpose of the Robinson-Patman Act. We therefore affirm the dismissal of the price discrimination claim.

■ Count Three of Barnosky's complaint alleges that Union entered into tacit exclusive dealing agreements with its direct-served dealers in the Metropolitan Detroit area. The direct-served dealers purchased gasoline from Union pursuant to one of two different supply contracts, the Retail Dealer Gasoline Purchase Contract, or the Service Station Supply Agreement. The former required the dealer to purchase at least 50% of its gasoline requirements from Union; the latter has no requirements provision at all. Barnosky alleges that the actual agreements between Union and these dealers went beyond the express language of the contracts, because Union in fact required the direct-served dealers to

purchase all of their gasoline requirements from Union. The complaint states that Union policed this arrangement by comparing the retailers' pump meter readings showing gallons sold with Union's records of gallons purchased from Union during the same periods of time. When Union found that a direct-served dealer made an "outside" purchase, Union allegedly enforced the exclusive dealing term implicit in its contract with the station. Barnosky further alleges that at least eight other major oil companies in the metropolitan Detroit area have maintained these exclusive dealing arrangements.

Barnosky claims that Union's alleged exclusive dealing contracts with the direct-served dealers have substantially lessened competition in the marketing of refined petroleum fuels, in violation of section 3 of the Clayton Act, 15 U.S.C. § 14. Also, through these contracts, Union has horizontally allocated customers to itself in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

The District Court held that these allegations did not amount to a violation of either statute. It noted that section 1 of the Sherman Act is directed only at joint action, and that Barnosky did not allege a conspiracy or concerted action among the major petroleum marketers. It also ruled, citing *Ace Beer Distributors, Inc. v. Kohn Inc., supra*, that Union was merely acting as a manufacturer substituting one distributor for another in a competitive market. In the court's view, these actions were not unreasonable restraints of trade in violation of the Sherman Act.

The District Court construed the Clayton Act charge as alleging an illegal tying arrangement, whereby Union tied the use of its trademark to the purchase of its gasoline. It rejected this claim on two grounds: 1) the Union trademark and the gasoline sold by Union to its retailers did not constitute two separate products capable of being tied; and 2) even if there was a tie-in, it was justifiable as a legitimate business practice.

To the extent that Count Three alleges the existence of a horizontal customer allocation, we agree with the District Court. Barnosky does not allege in this count the existence of a contract, combination, or conspiracy to allocate customers between Union and any of its competitors, be they Union jobbers or other manufacturers or wholesalers of gasoline. However, Barnosky correctly points out in its brief that the alleged agreements between Union and the direct-served dealers satisfy the concerted action element of an *exclusive dealing* claim under section 1 of the Sherman Act. Such a claim does not appear in the complaint. The only section 1 violation alleged in Count Three is the horizontal customer allocation referred to above. As a practical matter, this is not very significant; Barnosky can apparently pursue the exclusive dealing claim under the broader proscriptions of section 3 of the Clayton Act, and if the arrangement is legal under that section, it is also legal under the less stringent Sherman Act.[12] *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580 (1961).

With respect to Barnosky's exclusive dealing claim under section 3 of the Clayton Act, Union contends that it is clear that Union does not utilize such arrangements with its direct-served dealers. It points out that its supply contracts and lease arrangements with those dealers contain no such provision. Union also contests Barnosky's allegation that an exclusivity provision was implicit. It asserts that the pump readings referred to in the complaint were not made to monitor "outside" purchases of gasoline, but rather to determine both the amounts of consigned gasoline sold, and the rentals, which are often based on the volume of gasoline sold from a leased station.

12. Of course, to the extent that the alleged exclusive dealing arrangements cannot be reached under section 3 of the Clayton Act, Barnosky can only resort to a claim under section 1 of the Sherman Act, and must move for leave to amend the complaint in the trial court. This would occur, for example, if the contracts objected to were bona fide consignment agreements rather than sales agreements.

The absence of an express exclusivity requirement in Union's contracts with its direct-served dealers does not foreclose Barnosky's claim. "A course of dealing between seller and buyer may 'ripen into an implied or informal agreement or understanding.'" *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 337 (4th Cir. 1959). The existence of such an agreement or understanding, of course, must be evaluated in light of all the circumstances peculiar to the case at hand." *Dillon Materials Handling, Inc. v. Albion Industries*, 567 F.2d 1299 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978). *See also Alles Corp. v. Senco Products, Inc.*, 329 F.2d 567 (6th Cir. 1964). To support its exclusive dealing claim, Barnosky filed a deposition of Donald C. Eichten, manager of the Auto/Truckstops in Union's Eastern Region, and a statement of Peter Buis, a former Union sales manager. Both documents contained statements to the effect that Union coerced its direct-served dealers into purchasing all of their gasoline requirements directly from Union.

The existence of Union's alleged exclusive dealing agreements is a factual issue that can only be resolved on remand. The District Court did not address this issue directly,[13] and it is clear that the question could not be disposed of properly on either a motion to dismiss or a motion for summary judgment. The record before us demonstrates a genuine issue of material fact—whether the relationship between Union and its direct-served dealers was such that the dealers were precluded from purchasing gasoline from another source. Barnosky must be allowed the opportunity to prove its allegation.

Union argues that even assuming the existence of the alleged exclusive dealing agreements, those agreements do not violate section 3 of the Clayton Act under the test set forth in *Tampa Electric v. Nashville Coal Company, supra.* In *Tampa Electric* the Supreme Court announced a three-step

analysis for scrutinizing exclusive dealing arrangements under the Clayton Act:

> *First*, the line of commerce . . . involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. *Second*, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected. . . . *Third*, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited. . . .

*Id.* at 327–28, 81 S.Ct. at 628 (footnote omitted).

The Court went on to list several factors relevant to the determination whether the exclusive dealing contract at issue forecloses competition in a substantial share of the relevant market:

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

*Id.* at 329, 81 S.Ct. at 629.

The District Court never conducted this analysis. As noted above, the court apparently reasoned that since Union was entitled to terminate its jobber sales agreement with Barnosky altogether under *Ace Beer*, it was also entitled to sever Barnosky's

---

**13.** The District Court held that even if the alleged exclusive dealing agreements existed, such agreements could not be violative of section 1 of the Sherman Act or section 3 of the Clayton Act.

relationship with the direct-served dealers, a less drastic step than termination. We disagree, and hold that *Ace Beer* is not controlling. "There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another." *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911, 915–16 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). *See also Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

We also disagree with Union's suggestion that we may determine from the record before us whether the alleged exclusive dealing arrangements could have the probable effect of substantially lessening competition. The "facts" it relies on in its brief are contained in an exhibit to the affidavit of Robert Koch. We think that this issue should be decided on remand, after appropriate fact-finding, rather than on the basis of an undeveloped record. "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

In remanding this issue to the trial court for further proceedings, we note that Barnosky is also entitled to pursue whatever action is available to it under Michigan law with respect to the exclusive dealing allegation in Count Three.

The District Court construed Count Three to allege an illegal tying arrangement. Two class representatives of automobile service station dealers, plaintiffs in a pending case, *Bogosian v. Gulf Oil Corp., et al.*, Civ. No. 71–1137 (E.D.Pa.), filed an *amicus* brief contending that this claim was never alleged, briefed, or argued in the court below, and that this aspect of the District Court's decision should therefore be vacated for lack of jurisdiction. We agree.

Count Three of Barnosky's complaint does not mention tying arrangements. Un-

ion argues, however, that Barnosky's brief in opposition to Union's Motion for Dismissal or Summary Judgment repeatedly alleged "tying" and characterized Count Three as including such an allegation. Although it is true that Barnosky's brief refers to a tying arrangement allegation, we think it is clear from the record that no such allegation was in fact presented to the court. Neither of the briefs presented to the court below presented any discussion of the elements of a trademark-tying claim. In fact, Barnosky explicitly distinguished its section 3 claim from a trademark-tying claim. The trademark-tying issue addressed by the District Court, like the one presented in *Bogosian*, challenges the practice whereby an oil company conditions a dealer's use of the company's trademark upon the purchase of gasoline from the company, despite the availability of equivalent gasoline from other oil companies. Because Barnosky seeks only to sell Union branded gasoline to the direct-served dealers, it has no reason to raise the trademark-tying issue.[14] Rather, Barnosky alleges that Union has excluded Union's own branded jobbers from selling Union's *own* branded gasoline to Union's direct-served dealers.

We conclude that the trademark-tying claim was not raised by the parties to this action. To the extent that it addresses such a claim the District Court's opinion is advisory, and that portion of its judgment is therefore vacated. *See Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

To conclude, we affirm the judgment of the District Court as to Counts One, Two, and Four of the complaint. We reverse that part of the judgment dismissing Count Three. The dismissal of Count Five is also reversed to the extent that it alleges state claims paralleling the federal claim of exclusive dealing in Count Three. Finaly, the portion of the District Court's opinion relating to trademark-tying is vacated. The case is remanded for proceedings consistent with this opinion.

14. Barnosky states in its brief on appeal that it remains "puzzled" by the District Court's discussion of the issue. Brief for Appellant at 51, n.18.