MOORE, Circuit Judge,
majority in part and concurring in part.
While I agree with Judge Rogers’s reasoning in Part II.C. of his opinion, with respect to the question of whether the convenience stores (“stores”) are genuinely in competition with the vending-machine vendors (“vendors”), I do not agree that any of the plaintiff-vendors lack statutory standing. I therefore disagree with Part H.B., and write separately to express my conclusion that all plaintiffs have standing to challenge what are best considered violations of § 2(d) and (e) of the Act.
Plaintiff-vendors in this case allege violations of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), and (e) (“Act”). The district court granted Philip Morris’s motion for summary judgment partially on the basis that the majority of the plaintiffs did not have statutory standing, as they did not purchase directly from Philip Morris. I believe that this determination was in error, and I would therefore reverse the district court’s judgment in its entirety.
I agree with Judge Rogers that it is best to consider separately standing under § 2(a), prohibiting discriminatory pricing, and under § 2(d) and (e), prohibiting discriminatory provision of or reimbursement for promotional services. Under either statutory provision, however, I believe plaintiffs have standing. I would therefore allow all of the plaintiffs to proceed on all of their claims.
I. The Vendors’ Claims are Best Analyzed as § 2(d) Claims
Section 2(a) of the Act makes price discrimination, or the contemporaneous sale of goods of like quality to two different purchasers for two different prices, illegal. In addition to “direct” price discrimination, courts have held that § 2(a) also extends to “indirect” price discrimination, where identical price structures are made disparate through, for example, the granting of rebates, the payment of shipping costs, or the provision of free goods. See Corn Prods. Refining Co. v. FTC, 324 U.S. 726, 732, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); National Dairy Prods. Corp. v. FTC, 412 F.2d 605, 608, 611-12 (7th Cir.1969); see also 14 HERBERT HoVENKAMP, AnTITRÜST Law ¶ 2322 (1999). Subsections 2(d) and (e), prohibiting the payment of “anything of value” in consideration for services rendered or facilities furnished in the resale of goods or the provision of those ser *535 vices or facilities themselves, also cover the provision of free goods to a reseller. 15 U.S.C. § 13(d), (e); see HovenKAMP, supra, ¶ 2322b. There is therefore some overlap between § 2(a) and § 2(d) and (e), where a supplier provides free goods or provides rebates or other payment for particular services. Here, three of Philip Morris’s promotional programs are under attack as Robinson-Patman violations: its price promotions, where the stores sell cigarette packs at a discount and are refunded the amount of the discount by Philip Morris; its product promotions, where the stores sell a certain number of packs for the price of a lesser number of packs, and are provided the extra pack or packs by Philip Morris (through product rebates); and its incentive promotions, where gifts are supplied to the stores to give to the ultimate retail consumer.[1] The product and price promotions, which consist of payments from Philip Morris to the stores, either in the form of a product rebate or a price rebate, seem potential § 2(a) violations as well as potential § 2(d) and (e) violations. Because each of these programs aims at providing benefit to the retail consumer, and results only in increased sales volume for the stores, rather than greater profit on each individual sale through a decreased wholesale price, I believe these programs are each best considered as § 2(d) and (e) violations. Philip Morris provides the free goods to the stores with the requirement that they pass those goods on to the ultimate retail customer; Philip Morris does not provide the free goods directly to the stores to dispose of as they wish. Courts that find a § 2(a) violation in the provision of free goods do so where free goods are provided to a purchaser who is then free to sell each good at any price she wishes. There the provision of free goods makes the “actual price” paid by the retailer for each individual good lower. See National Dairy Prods., 412 F.2d at 608. Here, however, the profit the convenience stores receive remains steady for each pack of cigarettes purchased, as the benefit of the product rebate from Philip Morris is always offset by the cigarettes given away. Philip Morris’s decision to provide free goods does not result in an overall increase in the profit received on each individual purchased good. See id. I believe that the promotional programs are therefore best analyzed under § 2(d) and (e). Cf. R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., 2000-1 Trade Cas. (CCH) ¶ 72,799 (N.D.Ill.1999) (discussing interaction of § 2(a) and (d) and (e) vis-a-vis provision of free goods).
II. Under the Rule of Fred Meyer, Plaintiffs are Philip Morris’s “Customers” for the Purposes of § 2(d) and (e)
Judge Rogers argues that FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), can be distinguished from the present case on the basis that the favored customers in this case, the stores, do not purchase directly from Philip Morris. However, Fred Meyer’s holding that the word “customer” in § 2(d) encompassed customers who purchased through a wholesaler, as well as direct-buying customers, should be applied to every use of the word “customer” in § 2(d) *536 and not merely the third use thereof.[2] Section 2(d) states:
Payment for services or facilities for processing or sale. It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
In Fred Meyer, the Court held that § 2(d)’s reference to “customers competing” with the favored customer included retailers who purchased a supplier’s goods through a wholesaler where the favored customer (respondent Fred Meyer) purchased directly from the supplier. In that case, respondent grocery store’s suppliers paid Fred Meyer in cash or in kind to feature their products in an annual coupon book without offering the same promotions to Fred Meyer’s competitors, retailers who purchased through a wholesaler. Id. at 344-45, 88 S.Ct. 904. In broadly defining “customers competing,” the Court emphasized a functional analysis of the Act’s terms, reasoning that “the proscription of § 2(d) reaches the kind of discriminatory promotional allowances” at issue in the case, but concluding that “Meyer’s retail competitors, rather than the two wholesalers, were competing customers under the statute.” Id. at 348, 88 S.Ct. 904. The Court specifically rejected the “narrow definition of ‘customer’ ” offered by Fred Meyer, “which becomes wholly untenable when viewed in light of the central purpose of § 2(d) and the economic realities with which its framers were concerned.” Id. at 349, 88 S.Ct. 904.
The usual presumption that “the same words used twice in the same act have the same meaning,” 2A Norman J. SingeR, Statutes and Statutory Construction § 46:06, at 193 (6th ed.2000), operates with even greater force here, where the same word is used twice within the same sentence within the same subsection of the Act. See Gustafson v. Alloyd Co., 513 U.S. 561, 568, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Given the clear holding in Fred Meyer that the third use of the word “customer” in § 2(d) includes customers who purchase through a wholesaler, it would take an extremely strong showing of Congressional intent to defeat the conclusion that the first use of the word “customer” in the same sentence carries the same meaning. While the functional analysis used in Fred Meyer may not weigh as heavily in favor of plaintiff-vendors’ claims here as it did in favor of the FTC’s argument in that case, it provides nothing near the showing necessary to establish that the meaning of “customer” in § 2(d) is not uniform.
In Fred Meyer, the Supreme Court based its interpretation of the Robinson-Patman Act on the functional reasons behind passage of the Act. Specifically, the Court reasoned that Congress had intend *537 ed to protect smaller businesses, who could not afford to purchase directly from suppliers, against the concessions larger chains would be able to force as a result of their greater market power and direct dealings with the supplier. Fred Meyer, 390 U.S. at 350-53, 88 S.Ct. 904. Here, of course, the favored purchasers (the convenience stores) are not large chain stores buying directly from the supplier, but stores purchasing instead through a wholesaler. This intermediary cannot serve to distinguish the factual situation from that in Fred Meyer where, as here, the allegedly discriminatory supplier (Philip Morris) and the favored purchasers (the convenience stores) have direct dealings that are the allegedly unlawful behavior. That is, the functional difference between a direct purchaser and one who purchases through a wholesaler is only important where the passage through an intermediary insulates the supplier from its retailers, such as in typical price discrimination claims where the wholesaler, not the supplier, sets the actual price for the retailer. Here, the complained-of behavior consists only of promotional services rendered by Philip Morris directly to the favored stores, without any involvement of the wholesaler. Each of these promotions involves sustained contact and exchange of goods, services, and cash between Philip Morris and the stores. While the wholesaler sets the price of cigarettes that the store, purchases, discrimination in that wholesaler-set price is not at issue in this case; the price discount provided by the promotions is. Philip Morris sets the terms of each promotion, monitors compliance with that promotion, and provides the benefit of each promotion directly to the convenience stores. See Judge Rogers’s op. at 5; Plaintiffs’ Brief at 5-7; Defendant’s Brief at 7-8.
Given the strong presumption in favor of unitary meaning of terms in the same statutory provision, and the Supreme Court’s decision in Fred Meyer, where the complained-of services are provided directly to the retailer by the supplier, I conclude that “customer” includes those favored customers (the convenience stores in this case) who purchase through a wholesaler, and accordingly conclude that all plaintiff-vendors have statutory standing to challenge these promotions as violations of § 2(d) and (e) of the Act.
III. If Plaintiffs’ Claims are Considered Under § 2(a), the Proper Application of the Indirect-Purchaser Doctrine Would Confer Statutory Standing on All Plaintiffs
Although the promotional programs at issue are best considered as alleged violations of § 2(d) and (e) for the reasons noted above, even if they are considered as alleged violations of § 2(a) of the Act, all vendors still have standing.
The meaning of “purchaser” in § 2(a) has been held to be the same as that of “customer” in § 2(d) and “purchaser” in § 2(e). See American News Co. v. FTC, 300 F.2d 104, 109 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962). That same court, however, was doubtful when faced with the applicability of Fred Meyer to § 2(a), expressing concern over requiring vertical price maintenance that might run afoul of the Sherman Act. See FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1026 & n. 8 (2d Cir.1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). At least one other court has rejected the application, choosing instead to apply the “indirect buyer” rule of § 2(a) that predated Fred Meyer. See lams Co. v. Falduti, 974 F.Supp. 1263, 1271-72 (E.D.Mo.1997). Other courts, however, have chosen to apply Fred Meyer to § 2(a). See White Indus., Inc. v. Cessna Aircraft Co., 657 *538 F.Supp. 687, 701-03 (W.D.Mo.1986), aff'd, 845 F.2d 1497 (8th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 146, 102 L.Ed.2d 118 (1988); Julius Nasso Concrete Corp. v. DIC Concrete Corp., 467 F.Supp. 1016, 1019-20 (S.D.N.Y.1979);[3] see also Checker Motors Corp. v. Chrysler Corp., 283 F.Supp. 876, 887 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) (treating Fred Meyer as a particular application of indirect-purchaser rule). Appel-lee Philip Morris argues and Judge Rogers accepts that this court’s case Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74 (6th Cir.1981), forecloses the application of Fred Meyer to § 2(a). Bar-nosky dealt with a price-discrimination claim by an independent jobber (Barno-sky), who claimed that the supplier’s (Union Oil) sales to its own branded retail outlets at a lower price than Barnosky could afford to charge to its retail customers violated § 2(a). Id. at 83. In rejecting that claim, this court relied exclusively on the indirect-purchaser doctrine and did not cite Fred Meyer in doing so. While I doubt that this serves to preclude our application of Fred Meyer to the potential § 2(a) violations in this case, and Bamo-sky is in any event distinguishable as the more typical case where the supplier exercises no control over the price or the discount offered to the purchaser through the wholesaler, I believe it is unnecessary to decide the question, because the indirect-purchaser doctrine adopted in Bamosky properly applies in this case.
The indirect-purchaser doctrine was adopted primarily to stop suppliers from setting up dummy wholesalers to evade the Act; in its simplest terms, the doctrine applies when the supplier of a product so closely controls the terms of that product’s resale through a wholesaler that the supplier can be said to be the actual seller to the purchaser. Hovenkamp, supra, ¶ 2311b; see Purolator Prods., Inc. v. FTC, 352 F.2d 874, 883 (7th Cir.1965), cert. denied, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968). In the usual § 2(a) claim, the complained-of price discrimination consists of prices set by the actual seller, whether a direct seller or a supplier in control of its wholesaler, that differ between one purchaser and another. The price and the discrimination constitute an integrated whole, and where retailers attempting to use the indirect-purchaser rule cannot establish that suppliers control the price set by the wholesaler, the suppliers are immune from discrimination claims. Plaintiffs attempting to assert themselves as indirect purchasers are usually the customers of a wholesaler, competing with direct-purchasing customers, and are hamstrung by their purchase from an *539 intermediary that sets the price and therefore perpetrates the eomplained-of “discrimination.”[4] Here, however, the complained-of price discrimination is not the price set by the wholesaler, but the discount set directly by Philip Morris. Inasmuch as the provision of free goods constitutes a violation of § 2(a) as indirect price discrimination, the provision of free goods to certain retailers by Philip Morris is the § 2(a) violation — not the price set by the wholesaler. Therefore, the extension of that discount to certain retailers (the stores) and not to others (the vendors), where Philip Moms controls entirely the terms of that discount, constitutes price discrimination under the Act.
IV. Conclusion
Because I believe the district court erred in granting summary judgment to defendant with respect to the vendors who do not purchase directly from Philip Morris, I would reverse the judgment in its entirety and allow all plaintiffs to proceed on both Counts I and II.

. In addition, plaintiff-vendors complain of additional promotional fees, racks, fixtures, and signage made available by Philip Morris to their store competitors. Plaintiffs’ Brief at 31. To the extent these programs reflect a Robinson-Patman violation, they are violative of § 2(d) and (e) as the provision of or payment for promotional and advertising programs.

. While the product promotions offered by Philip Morris and the provision of free goods by Philip Morris may be violations of § 2(e) rather than § 2(d), the statutory sections have long been considered as a cohesive whole, and the meaning of "purchaser” in § 2(e) as coterminous with that of "customer” in § 2(d). Kirby v. P.R. Mallory & Co., 489 F.2d 904, 909 (7th Cir.1973), cert. denied, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); see Hovenkamp, supra, ¶ 2363b, at 241.

. Julius Nasso inexplicably fails to distinguish FLM Collision Parts; it is worth noting, however, that FLM dealt with price differentiation ¿níra-purchaser — each customer of Ford was charged a different price based on the identity of the ultimate purchaser, and FLM attempted to use Fred Meyer to argue that Ford was required to equalize the price ultimately charged to competing wholesalers. FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1026-27 (2d Cir.1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Ford sold its parts to its franchised dealers, charging them less when they resold the part to an independent auto repair shop than when they sold the part to an independent wholesaler such as FLM, effectively pricing FLM out of the wholesaling business. Id. at 1023-24. The key point for the FLM court was that Ford did not discriminate between different purchasers, but instead between its purchasers in one guise — that of retailer — and another — that of wholesaler. Ultimately, FLM’s rejection of Fred Meyer's applicability to § 2(a) seems very much confined to the facts of that case. Id. at 1026.

. See, e.g., Barnosky Oils, Inc. v. Union Oil Co. of Cal., 665 F.2d 74 (6th Cir.1981). In that case, Union was actually selling to Bamosky at a lower price than to Union's retail outlets; Bamosky’s claim on behalf of its retail customers was that the price wasn't "lower enough” to allow its customers to compete. Courts have consistently rejected attempts to use Robinson-Patman to preserve a particular level in a distribution system into perpetuity, see Conoco Inc. v. Inman Oil Co., 774 F.2d 895, 904 (8th Cir. 1985); see also Barnosky, 665 F.2d at 83-84; FLM Collision Parts, 543 F.2d at 1025-26.