**PUROLATOR PRODUCTS, INC.,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 14704.

United States Court of Appeals
Seventh Circuit.

Oct. 22, 1965.

Sumner S. Kittelle, Allan Trumbull, Willkie, Farr, Gallagher, Walton & Fitz-Gibbon, New York City, Frederick A. Jackson, New York City, of counsel, for petitioner.

J. B. Truly, Asst. General Counsel, Washington, D. C., James McI. Henderson, General Counsel, Alvin L. Berman, Charles C. Moore, Jr., Attorneys, for the Federal Trade Commission, for respondent.

Before HASTINGS, Chief Judge, and KNOCH and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

On petition of Purolator Products, Inc., we have for review a cease and desist order issued by Federal Trade Commission following an administrative proceeding upon a complaint charging Purolator with violating Section 2(a) of the Clayton Act, as amended.[1]

---

1. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination

The complaint charged that Purolator's distribution system and its prices and discounts resulted in unlawful price discrimination. The charges relate only to the sale of Purolator's automotive replacement filters. These filters are sold as replacements for worn original equipment on automobiles, trucks and other motor vehicles in what is known as the "after market" or "replacement market."

In 1957, Purolator's business in this market exceeded $5,000,000 and its present share of the market is about 32%. It is in national competition with leading members of the automotive industry and regionally with numerous other concerns.

After a full hearing, the hearing examiner found against Purolator and issued his initial decision, including an order to cease and desist. Commission adopted the order entered by the examiner, after some modification of the initial decision. Commissioner Elman did not concur and filed a separate opinion.

The parties entered into an extended stipulation of facts and exhibits incorporated therein. Commission rested its case on the stipulation. Purolator presented testimony and documentary exhibits in support of its defense. In finding a violation of the Act, Commission relied principally on the stipulated record.

The factual background of this case is rather complicated. We find little dispute concerning the following statement.

## PUROLATOR'S DISTRIBUTION SYSTEM

Purolator manufactures and sells its automotive replacement filters throughout the country. These are sold directly and only to independent warehouse distributors (WDs). WDs resell the filters to jobbers, fleet operators and to dealers (garages, service stations, etc.). Jobbers resell to dealers and fleet operators. Dealers resell to the consumer (the car owner). Fleet operators do not resell, but use the filters in their fleets (taxicabs, etc.). Purolator itself does not sell directly to jobbers, fleets, dealers or consumers. The channels of distribution may be shown as follows:

may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *." (38 Stat. 730 (1914), as amended by the Robinson-Patman Act, 49 Stat. 1526 (1936) ; 15 U.S.C. § 13(a)).

Some jobbers are affiliated with (i. e., own or control or are owned or controlled by) WDs, although they may be separate corporate entities. Most WDs with affiliated jobbers also sell to unaffiliated (independent) jobbers. Nonaffiliated jobbers and independent WDs are in direct competition with WDs having affiliated jobbers.

Finally, some WDs with affiliated jobbers receive the replacement filters at a central warehouse and later reship them to their affiliates, while other WDs with affiliates have Purolator send the filters directly to their affiliated jobbers. Thus, distribution by WDs through their affiliates is in reality internal redistribution or double handling.

## PUROLATOR'S PRICE STRUCTURE

The price which Purolator charges WDs for its filters depends upon the marketing channel through which the filters move to the ultimate consumer. Thus, if a WD sells to a jobber or a fleet operator, the WD receives a discount which he would not and does not receive on sales directly to dealers.

Purolator sells its automotive replacement filters to WDs according to the following discount schedule:

(1) to all WDs, a 5% discount on suggested resale prices to jobbers;

(2) to all WDs, a 15% discount on sales to unaffiliated jobbers;

(3) to WDs which distribute filters to affiliated jobbers, a discount equal to 4% of Purolator's suggested resale prices to jobbers.

On a hypothetical sales price to the ultimate consumer of $1.00, the suggested resale price to the jobber is 40¢ (or 34¢ when the jobber sells to a fleet operator). Purolator's prices to WDs, after discounts, would be as follows:

(1) to a WD without affiliated jobbers which sells to independent jobbers — 32¢ (60% − (5% + 15%));

(2) to a WD which distributes filters to affiliated jobbers who in turn sell to independent jobbers — 30.4¢ (60% − (5% + 15% + 4%));

(3) to a WD without affiliated jobbers which resells directly to dealers — 38¢ (60% − 5%);

(4) to a WD which distributes filters to affiliated jobbers who in turn sell to dealers — 36.4¢ (60% − (5% + 4%)).

(5) to a WD without affiliated jobbers which resells to a jobber reselling to a fleet operator — 26¢ (60% − (5% + 15% + 15%)).

(6) to a WD with affiliated jobbers who resell to fleet operators — 24.4¢ (60% − (5% + 15% + 15% + 4%)).

Jobbers compete with WDs in selling to dealers and fleet operators. If jobbers can be legally considered to be purchasers from Purolator, then the following further price differences exist. In reselling filters to dealers, a jobber pays 40¢ for the filter while WDs without affiliates pay 38¢ and WDs with affiliated jobbers pay 36.4¢. In reselling filters to fleet operators, jobbers pay 34¢ while WDs without affiliated jobbers pay 32¢ and distributing WDs with affiliated jobbers pay 30.4¢.

Thus it is clear that WDs which redistribute to affiliated jobbers receive a 4% discount that WDs which do not redistribute to affiliated jobbers do not receive. This extra 4% discount is known as the internal redistribution discount. The 15% discount which all WDs receive on sales to jobbers is known as the external redistribution discount.

The foregoing pricing schedules, exclusive of fleet prices, may be more graphically portrayed as follows:

## PUROLATOR'S SALES PROGRAM

Over the last 26 years, Purolator has done business with WDs under various forms of sales contracts and "attachments" to sales contracts. Attachments were revised from time to time and superseded previous attachments when adopted. All contracts Purolator has with WDs are not uniform. Some WDs continued to purchase from Purolator under agreements which are not the most recent of Purolator's sales contract forms.

Between January 1, 1957 and July 1, 1959, and for some years prior to that period, 58 of Purolator's WD customers

operated under a form of sales agreement which provided that the WD would distribute Purolator's automotive replacement filters through jobbers with whom the WD had executed an agreement approved by Purolator. From July 1, 1959 to the present four WDs have operated under this form of the agreement.

Eight of Purolator's sales contract attachments in effect seriatim between January, 1955 and July, 1959 require WDs to execute a contract, on forms provided by Purolator and having provisions written by Purolator, with their respective jobbers as a precondition for the payment of the external redistribution discount. For the most part, these contract forms are in use between WDs and jobbers.

At present the great majority of WD-jobber agreements on file with Purolator provide that the jobber will maintain a stock of Purolator automotive replacement filters and parts of a minimum value of $500 of the jobber's net cost. Superseded forms of this agreement also provided that the distributor would supply the filters to the jobber at a price determined by Purolator's "blue" price list.

Since Purolator's external redistribution discount is based upon sales, most of the WDs are required to make monthly reports of sales to jobbers and to report sales figures on the basis of Purolator's suggested jobber resale price list.

Purolator draws up suggested filter resale price lists and generally distributes them to WDs and jobbers. Jobbers and occasionally WDs and Purolator's salesmen distribute the lists to dealers. Generally, Purolator's suggested prices are followed. When sales are made at prices below Purolator's schedule, Purolator encourages adherence to the schedule through oral persuasion.

Purolator has a sales force of about 80 employees which contacts jobbers to promote sales of Purolator's automotive replacement filters and which sometimes takes and transmits jobbers' orders for the filters to WDs.

## ADMITTED VIOLATION

Purolator has admitted a price discrimination and violation of the Act with respect to Purolator's granting an external redistribution discount of 15% to one WD (referred to as "Warehouse Distributor A"), when that WD resold to dealers. Other WDs were not granted the external redistribution discount when selling to dealers. The only question concerning this violation is the scope of the order to be issued.

## COMMISSION'S FINDINGS

From the foregoing undisputed facts, upon which complaint counsel relied in its case against Purolator, Commission made its findings.

After quoting the stipulation of facts to the effect that automotive parts wholesaling is a highly competitive business having high costs and low profit margins and that wholesalers consider small percentage discounts to be important, perhaps crucial, to a profitable business, Commission found that the systematic granting of a price differential between Purolator's customers had a tendency to injure competition. In so finding, Commission rejected as not being relevant to the issue of competitive injury cost studies which Purolator offered in evidence. These cost studies, Purolator asserted, demonstrated that the 4% discount Purolator granted to WDs which redistribute to affiliated jobbers was less than the cost of redistribution those WDs bore.

Commission next found that the jobbers who purchase only from WDs were "purchasers" of Purolator within the meaning of Section 2(a) of the Act. In arriving at the conclusion that jobbers were the "purchasers" of Purolator, Commission applied the "indirect purchaser" concept to the facts of the case. That is, Commission held that Purolator exercised enough control over the terms of the sale between the WDs and jobbers that the jobbers could be considered to be purchasers of Purolator.

Commission used the following standards in arriving at its conclusion that jobbers were purchasers of Purolator:

"Where the prices to be charged the indirect purchaser are effectively established by the manufacturer, and where virtually all the conditions and terms upon which the sale is to be consummated are fixed by the manufacturer or are subject to its approval, the predicate for a finding that the indirect purchaser is a purchaser from the manufacturer has been constructed. Other factors to be considered in arriving at the conclusion are instances of direct contact between the indirect purchaser and the manufacturer, such as direct negotiation of franchise agreements, direct solicitation of orders by the manufacturer's salesmen even though the orders are filled by the intermediary and the manufacturer looks to the intermediary for payment, direct negotiations for changes in price, direct policing of the indirect purchaser's resale prices, direct provision of advertising materials, and inspection by the manufacturer to insure that the indirect purchaser is fulfilling the terms of its agreement with the manufacturer's distributor or wholesaler."

Purolator claimed that its cost of channeling its filters through a WD to a jobber and thence to a dealer was 6¢ greater than its cost of selling to a dealer through a WD. Purolator asserted that this was so because the WD which sold directly to a dealer paid Purolator 6¢ more than a WD who sold through a jobber. Commission concluded that this contention of Purolator did not satisfy the cost justification defense of Section 2(a) of the Act because Purolator was in fact attempting to use its prices rather than its costs to justify its differences in prices to WDs.

Finally, Commission found, *inter alia,* that Purolator's adoption of the 4% internal redistribution discount was not made in good faith to meet competition (a Section 2(b) defense) because the discount was not an individual response to competition and because Purolator filters were not shown to be of the same quality or to have the same public acceptance as those of Purolator's competitors.

■ It is well settled that Commission findings of fact are to be upheld if supported by substantial evidence. 15 U.S.C.A. § 21(c); National Macaroni Manufacturers Association v. F. T. C., 7 Cir., 345 F.2d 421 (1965); National Lead Company v. Federal Trade Commission, 7 Cir., 227 F.2d 825 (1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); Fort Howard Paper Co. v. Federal Trade Com'n, 7 Cir., 156 F.2d 899 (1946), cert. denied, 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680 (1946).

■ The weight to be given to facts stipulated or proven, as well as the inferences to be drawn therefrom are for Commission, and not the courts, to determine. Corn Products Co. v. Comm., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); Trade Comm. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L. Ed. 1338 (1945); Federal Trade Comm. v. Pacific States Paper Trade, Ass'n., 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534 (1927); National Macaroni Manufacturers Association v. F. T. C., 7 Cir., 345 F.2d 421 (1965).

■ It cannot be said that Commission's conclusion that injury to competition could result from Purolator's pricing system is not supported by the evidence or that it is unreasonable since the Act requires only a showing of the possibility of injury to competition. E. Edelmann & Company v. Federal Trade Commission, 7 Cir., 239 F.2d 152 (1956); cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958).

Purolator contends that Commission refused to allow Purolator to use customer cost evidence to disprove competitive injury while Commission itself used customer cost evidence to prove competitive injury. Purolator claims that its customer cost studies were relevant to the issue of competitive injury and that Commissioner, by rejecting the studies and

admitting cost evidence of complaint counsel, established two rules of evidence, one favoring complaint counsel and one disfavoring Purolator.

Purolator's cost studies showed that the cost of redistribution to affiliated jobbers by WDs was in all cases greater than the 4% internal redistribution discount Purolator granted these WDs. If such is the case, Purolator argues, then the WDs receiving the 4% discount did not receive a net advantage, and, therefore, competition was not and could not be injured.

■ Purolator's offer to prove that the advantage to WDs with affiliated jobbers was dissipated was not an offer to prove that the WDs did not on the whole receive an advantage from the 4% discount. Companies competing in the same line may experience different costs, and if those costs are a result of the company's method of operation, evidence that a seller helped some of its customers defray those costs while it did not help others is not relevant to disprove competitive injury. Such evidence only tends to show that some WDs have costs peculiar to their manner of doing business; it does not show nor could it show that competitors of these WDs would not be injured if some of those costs are paid by Purolator.

■ Commission, on the other hand, used industry-wide profit and cost averages, rather than individual customer costs for redistribution of a line, to show that wholesalers of automotive parts operated on small per unit profit margins. With such small profit margins in a highly competitive industry, an incremental price advantage per unit could be the difference between a successful or unsuccessful business in the automotive replacement filter line. Commission evidence was not the same type of evidence Purolator offered and clearly goes to the question of competitive injury. Cf. E. Edelmann & Company v. Federal Trade Commission, 7 Cir., 239 F.2d 152 (1956), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958).

We conclude that Commission did not create two rules of evidence, one favoring itself and the other disfavoring Purolator. Commission merely assessed the relevancy of Purolator's proffered evidence and did so properly.

Purolator further asserts that if probable competitive injury existed, its 4% discount did not cause it, for Purolator's nonfavored WD customers were able to purchase automotive replacement filters from Purolator's competitors at lower prices than Purolator charged. Hence, Purolator claims, there is no causal nexus between the competitive injury and Purolator's price discrimination. As authority Purolator cites Tri-Valley Packing Association v. F. T. C., 9 Cir., 329 F.2d 694 (1964).

In that case, the court remanded proceedings to Commission for the purpose of finding facts relating to the availability to non-favored purchasers of the same prices that respondent granted to favored purchasers for the same product in the same market. But in Tri-Valley the question of availability of lower prices to non-favored purchasers related to the *seller's* product, and not, as here, to similar products of competitors.

■ Competitive injury in the instant case could not be due to the failure of non-favored buyers to take advantage of buying the product at the same prices as the favored buyers, for the non-favored buyers could not buy Purolator's filters at the same prices. The required causal nexus for competitive injury is established by a showing that there is a demand for Purolator's filters and not just a general demand for automotive replacement filters.

■ The Commission's finding of probable competitive injury and Purolator's responsibility for it was supported by substantial evidence.

There are obvious price discriminations in this case since there are price differences to Purolator's different classes of competing customers. F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 549–551, 80 S.Ct. 1267, 4 L.Ed.2d 1385

(1960). Although price discriminations exist, the question remains whether the Act proscribes or excuses the particular discrimination.

There are in this case two general price discriminations, the price differential between jobbers and WDs and the price differential between WDs without affiliated jobbers and WDs with affiliated jobbers. These two discriminations may be treated separately.

It seems clear that if jobbers can be considered to be purchasers from Purolator within the meaning of the Act, then the fact that WDs pay Purolator less on sales to dealers and fleet operators than competing jobbers pay would amount to a price discrimination under the Act.

Purolator challenges the Commission finding that jobbers were purchasers from Purolator on the ground that the indirect purchaser concept used by Commission has no legal basis. If the indirect purchaser concept is legally sound, Purolator asserts that Commission has not shown that Purolator exercises the amount of control required to justify Commission's application of the concept.

Commission has used an indirect purchaser concept in the following cases: Kraft-Phenix Cheese Corporation, 25 F. T.C. 537 (1937); Luxor, Ltd., 31 F.T.C. 658 (1940); Dentists' Supply Co. of New York, 37 F.T.C. 345 (1943); Elizabeth Arden, Inc., et al., 39 F.T.C. 288 (1944); aff'd 2 Cir., 156 F.2d 132 (1946), cert. denied, 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947); Champion Spark Plug Co., 50 F.T.C. 30 (1953); and General Motors Corp. et al., 50 F.T.C. 54 (1953).

The Second Circuit has upheld the indirect purchaser doctrine:

"If the manufacturer deals with a retailer through the intermediary of wholesalers, dealers, or jobbers, the retailer may nevertheless be a 'customer' or 'purchaser' of the manufacturer if the latter deals directly with the retailer and controls the terms upon which he buys." American News Company v. F. T. C., 2

Cir., 300 F.2d 104, 109 (1962), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L. Ed.2d 64 (1962).

To ensure fair competition among purchasers from the same seller, the Robinson-Patman Act amendments to the Clayton Act forbade sellers to make price discriminations between purchasers except when justified by economies to the seller. If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical, economic purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competition. American News Company v. F. T. C., supra.

While not passing upon the legality of the indirect purchaser doctrine because it was not challenged, this court in E. Edelmann & Company v. Federal Trade Commission, 7 Cir., 239 F.2d 152 (1956), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed. 2d 422 (1958) affirmed, without comment upon the doctrine, a Commission decision in which the doctrine was used.

The question whether the indirect purchase doctrine of Commission has a legal basis is what is said to be a mixed question of law and fact. See e. g., 4 Davis, Administrative Law Treatise, § 30. When similar questions concerning the application of statutory categories to facts have arisen, the Supreme Court has had occasion to accept an administrative agency's application of a statute if the application had a " 'warrant in the record' and a reasonable basis in the law." National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944).

"In a matter left specifically by Congress to the determination of an administrative body * * * the function of review placed upon the courts * * * is fully performed when they determine

that there has been a fair hearing * * and an application of the statute in a just and reasoned manner." Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 30 (1941).

In a recent case, the Supreme Court reviewed the action of a district court in the setting aside of an order of the Interstate Commerce Commission in which the Commission interpreted and applied the words "contract carrier by motor vehicle" in the Interstate Commerce Act. The Supreme Court stated:

> "The problem is one of determining—by reference to the clear but broad remedial purpose of a regulatory statute committed to agency administration—the applicability to a narrow fact situation of imprecise definitional language which delineates the coverage of the measure, * . * *. Because the Commission's resolution of the issue does not seem to us to violate the coherence of the body of administrative and judicial precedents so far developed in this area, we are of the opinion that there was no occasion for the District Court to disturb the conclusion reached by the Commission." United States v. Drum, 368 U.S. 370, 375–376, 82 S.Ct. 408, 411, 7 L.Ed. 2d 360 (1962).

 In view of the policy underlying the amendments to the Clayton Act, the indirect purchaser doctrine of Commission appears to have a reasonable application to the facts of this case and a rational basis in law.

Purolator further asserts, however, that if Commission's indirect purchaser concept is sound, Commission nevertheless has not shown that Purolator exercises the amount of control required to apply the concept. Purolator's proffered evidence would tend to show that in fact it had made no effort to control sales to jobbers. The stipulation, on the other hand, shows that Purolator at one time had reserved to itself the legal right to control sales and that Purolator wrote and supplied the WD-jobber agreements, as well as suggested resale price lists. The stipulation further states that Purolator solicited jobbers and urged them to maintain prices, which they for the most part did. Commission's finding is supported by substantial evidence.

 In so finding, it is not necessary to pass upon the degree of seller control required to constitute a buyer once or more times removed a purchaser within the meaning of the Act; it is only necessary to conclude that Commission's finding of control was reasonable in view of the evidence, even though a court might have interpreted the evidence otherwise. We so hold.

 Purolator claims that a "cost" incurred by a manufacturer in the form of a discount to a WD for redistributing to an affiliated jobber can be used as a cost-justification defense under § 2(a). What Purolator terms a cost to itself is merely the difference in the prices at which it sells to WDs. The cost justification intended by the Act relates to costs "of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *." 15 U.S.C.A. § 13(a).

Subsection (b) of Section 2 of the Act places the burden of rebutting a prima facie case of price discrimination by showing a justification upon the person charged with violation of the section. Although Purolator had the opportunity at the hearing before Commission of offering evidence as to its difference in costs of manufacture, sale, or delivery to different purchasers as contemplated by the Act, it failed to do so. Instead, it offered only evidence of its prices.

Purolator also claims that its 4% discount was made in good faith to meet an equally low price of a competitor, a § 2(b) defense under the Act. As with the cost justification defense, the burden of proof of the claim was upon Purolator, 15 U.S. C.A. § 13(b), and the findings of Commission are to be upheld if supported by substantial evidence, 15 U.S.C.A. § 21 (c); Federal Trade Comm'n v. A. E.

Staley Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945); C. E. Niehoff & Co. v. Federal Trade Commission, 7 Cir., 241 F.2d 37 (1957), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958); Whitaker Cable Corporation v. Federal Trade Com'n, 7 Cir., 239 F.2d 253 (1956); E. Edelmann & Company v. Federal Trade Commission, 7 Cir., 239 F.2d 152 (1956), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958).

The evidence which Purolator offered showed that originally Purolator granted the same total discount as its major competitiors, although its discount schedule was not identical to theirs After first raising its prices, Purolator lowered its prices to some of its WDs by 4%. Purolator states it changed its price discount schedule in the hope that WDs without jobber affiliates would concentrate on reselling to independent jobbers. These WDs would earn a 15% external redistribution discount. WDs with affiliated jobbers, however, sold to their affiliated jobbers in addition to selling to independent jobbers. On sales to their own jobbers, the WDs with affiliates were not granted a 15% discount. Purolator, in order to prevent defection to competitors of its customer-WDs with affiliates, granted a 4% internal redistribution discount to them.

WDs with affiliated jobbers, however, sell to independent jobbers. This qualifies the former for the 15% discount. As a result, in the case of a sale by WDs with affiliated jobbers to an independent jobber, Purolator goes below the prices of its competitors by 4%. Insofar as it does that, Purolator's defense of meeting competition in good faith fails for Purolator has more than met competition.

The situation is no different when WDs sell to dealers and to fleet operators. When selling to dealers, the WD discount is 60% off the car owner price plus 5%. If the WD resells to affiliated jobbers who in turn resell to dealers, the WD receives an additional 4% discount. Purolator's evidence of the price schedules of its two major competitors revealed that their discounts in dealer sales were 60% – 9% and 60% – 10%. Thus, only those customers of Purolator which had affiliated jobbers received a price equivalent to that of one of the major competitors (60% — (5% + 4%) versus 60% — 9%). WDs without affiliates which sold directly to dealers suffered a 4% disadvantage. If, as Purolator argues, it lowered its prices to meet the equally low prices of competitors, it did not lower its prices equally for all WDs which sold to dealers.

■ Purolator's argument that WDs reselling to affiliated jobbers do not receive the 15% external redistribution discount is not relevant here because there is no sale to a jobber. One group of WDs has been favored over another. We conclude that Purolator has not met its burden of showing that its 4% internal redistribution discount was offered to meet the equally low price of a competitor.

■ Purolator objects to the Commission order on the grounds that it merely paraphrases § 2(a) of the statute, that it is too broad, and that it is so vague, indefinite and uncertain that Purolator cannot know what it prohibits.

Purolator was ordered to cease and desist from:

"Discriminating, directly or indirectly, in the price of such products of like grade and quality: By selling to any direct or indirect purchaser at net prices higher than the net prices charged to any other purchaser, direct or indirect, who in fact competes with the purchaser paying the higher price in the resale and distribution of respondent's replacement filters."

This form of order is quite similar to that upheld by courts in other cases. See, e. g., Federal Trade Comm. v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952); Moog Industries v. Federal Trade Commission, 8 Cir., 238 F.2d 43 (1956), aff'd, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958).

This court in E. Edelmann & Company v. Federal Trade Commission, 7 Cir., 239

F.2d 152 (1957), cert. denied, 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958) approved an order in all respects almost identical to the present order. It was said there at p. 156:

"The order encompasses only the specific means by which petitioner has discriminated in the past and is broad enough to prohibit variances which would accomplish the same result. The Commission is not required to confine its order to the narrow area transgressed by petitioner, it must be permitted sufficient leeway so that its order may not be reduced to a nullity by technical, but not actual, compliance."

As to Purolator's inability to determine what is forbidden it, the Supreme Court has provided the answer:

"If, however, a situation arises in which respondents are sincerely unable to determine whether a proposed course of action would violate the present order, they can, by complying with the Commission's rules, oblige the Commission to give them definitive advice as to whether their proposed action, if pursued, would constitute compliance with the order." FTC v. Colgate Palmolive Co., 380 U.S. 374, 375, 394, 85 S.Ct. 1035, 1047, 13 L.Ed.2d 904 (1965).

We hold that Commission's order is within the permissible limits afforded Commission in this case.

Finally, pursuant to 15 U.S.C.A. § 21(c), Purolator has moved for leave to adduce additional evidence to be taken by Commission. By such evidence Purolator seeks to show that it does not incur costs in making direct sales which it does not incur in making indirect sales; and that its filters are the same grade and quality and enjoy substantially the same public acceptance as the filters of competitors whose competition it was allegedly meeting by its 4% discount.

We have carefully considered all propositions urged in support of the motion and Commission's objections thereto. Without further extending an opinion already much too long, it has not been shown to our satisfaction that such additional evidence is material. Further, Purolator has not established it had reasonable grounds for its failure to adduce such evidence in the prior proceeding before Commission. 15 U.S.C.A. § 21(c); F. T. C. v. Washington Fish & Oyster Company, 9 Cir, 271 F.2d 39, 43 (1959). The motion is denied.

For the foregoing reasons, the cease and desist order of the Federal Trade Commission under review in this proceeding is in all respects affirmed and will be enforced.

Order enforced.