**THE IAMS CO., Plaintiff,**

v.

**Anthony FALDUTI d/b/a Countryside Feed and Supply, Defendant.**

**No. 4:95CV1804 CDP.**

United States District Court,
E.D. Missouri,
Eastern Division.

May 20, 1997.

Michael J. Morris, David Wells, Thompson Coburn, St. Louis, MO, D. Jeffrey Ireland, Mary L. Wiseman, Faruki and Gilliam, Dayton, OH, for Plaintiff.

Jeffrey J. Lowe, Gray and Ritter, St. Louis, MO, for Defendant.

## AMENDED MEMORANDUM AND ORDER

PERRY, District Judge.

This matter is before the Court on plaintiff's motions for summary judgment on both its declaratory judgment action and defendant's counterclaim. Also before the Court is plaintiff's motion to strike an affidavit submitted by defendant in opposition to plaintiff's motion.

Plaintiff The Iams Company (Iams) manufactures dog and cat food. Defendant Anthony Falduti owns Countryside Feed and Supply and sells Iams pet foods as well as other brands. Falduti previously filed federal and state court actions against Iams and other pet-food manufacturers, alleging that their pricing and distribution systems violated the Robinson–Patman Act, 15 U.S.C. § 13, and Missouri's antitrust laws. Falduti voluntarily dismissed his first federal suit; the state suit is pending. Iams seeks a declaratory judgment that its distribution system does not violate federal antitrust laws. Falduti brings a counterclaim seeking injunctive relief under the Robinson–Patman Act, 15 U.S.C. § 13, and treble damages under the Clayton Act, 15 U.S.C. § 15.

## I. Relevant Factual Background

This dispute centers upon the relationship among retail-level competitors, a manufacturer, and its St. Louis-area distributor. Defendant/counterclaim-plaintiff Falduti alleges that plaintiff, The Iams Company, engages in price discrimination against him in favor of his competitors, PetsMart and Pet Care, and alleges vertical price and non-price restraints in the operation of Iams' dual-distribution system. Iams' distributor in the St. Louis area is NutriPet.

### A. The Competitors

Anthony Falduti owns Countryside Feed and Supply, a sole proprietorship in Florissant, Missouri, which sells large- and small-animal feeds. Countryside sells dog and cat food manufactured by Iams and many of Iams' competitors. His competitive strategy is to charge his customers low prices for premium pet foods and rely on volume to secure a profit. At one time, Falduti purchased sufficient quantities of Iams' products to qualify as one of its best customers in the St. Louis area. Between 1991 and 1995, however, his purchase of Iams' products decreased from 65,164 pounds to 5,536 pounds per year.

Countryside has always operated in Florissant, Missouri, with customers drawn from a forty-mile radius. In May 1993, after approximately ten years in its original storefront, Countryside moved to a new location about three blocks south on the same street. Countryside's new location was approximately one-and-one-half times the size of the first store and provided better parking for customers.

PetsMart and Pet Care are large multi-location "superstores" selling pet food and related products. PetsMart opened its first St. Louis-area store in October 1991, while Pet Care's first St. Louis-area store opened in June 1992. There are two PetsMart stores and two Pet Care stores within a 15-mile radius of Countryside. The development of these pet superstores has increased the competition among pet-food retailers. Some retailers have gone out of business while others, including Countryside, have seen their volume and profit margins decrease on sales of pet food.

### B. The Manufacturer

Iams manufactures premium dog and cat food sold under the brand names Iams and Eukanuba. The Iams products are sold in specialty retail stores, including Countryside and the superstores. They are generally not available through grocery stores. Iams ranks as either the first or second largest seller of premium pet foods.

At the heart of the present dispute is Iams' distributorship system. Iams distributes its product through two routes. First, Iams sells at wholesale to approximately twenty-five independent distributors[1] who sell to retailers such as Countryside. Second, Iams makes direct sales to large nationwide accounts such as PetsMart and Pet Care. Iams has never sold directly to Countryside.

Iams began direct sales to the large multistore accounts in 1991. Previously, the large stores bought Iams products through the distributors. Apparently the superstores were dissatisfied with inconsistent delivery schedules and regional differences in pricing, which interfered with their centralized purchasing systems. Under the present system, Iams receives orders directly from the superstore and fills them by repurchasing the necessary stock from the area's independent distributor, who then delivers the order to the superstore. The independent distributor functions as Iams' delivery agent to the superstore and Iams pays the distributor a delivery fee. The superstores purchase Iams products at a cost that is above the cost paid by Iams' distributors.

## C. *The Distributor*

Since at least 1988, Countryside has purchased its Iams pet food almost exclusively from NutriPet. NutriPet was initially an Iams-owned distributor but was purchased by its present owner, Norman Worthy, in 1986. NutriPet sells only Iams' dog and cat foods, though it also carries bird food, cat litter, pet shampoos and pet toys. Another distributor, Bushmill, had previously supplied Iams to St. Louis-area retailers, although Countryside only used Bushmill as a "backup" supplier, purchasing Iams product from Bushmill on only three or four occasions, or "a handful" of times. In 1993, NutriPet acquired Bushmill's Iams' territory and accounts and thus became the sole St. Louis-area distributor.

The parties dispute the degree of control that Iams exercises over its independent distributors. NutriPet president, Norman Wor-

thy, testified by affidavit and deposition that NutriPet and Iams have a non-exclusive agreement under which NutriPet may sell Iams' competitors' products, but that NutriPet chooses to sell exclusively Iams food products. Shortly after he purchased NutriPet from Iams, Mr. Worthy exercised his contractual option to sell a competitor's food. He testified in deposition that in 1987 he added Ralston Purina products because he thought he could expand his rural base by adding large-animal feed. As required by his contract, he gave Iams thirty days notice of his intention to carry Purina stock. He testified that he spoke with Iams President and owner, Clay Mathile, who was unhappy about his decision to carry a competitor. Worthy also testified that he was aware that, under the terms of his distributorship agreement with Iams, Iams reserved the right to terminate the agreement if NutriPet carried a competitor's products. Worthy stated that none of the Iams' representatives with whom he spoke mentioned the termination clause. Nonetheless, within two weeks of adding the Purina line, Worthy decided to drop it because it was not cost effective.

There are twenty-seven PetsMart and Pet Care superstores in NutriPet's territory. Despite its limited role as Iams' delivery agent to PetsMart and Pet Care, NutriPet salespeople call on the superstores at least once or twice per month to ensure that they have adequate supplies of Iams products. Steve Gaffney, a former NutriPet salesperson, testified that when he went to the superstores he would check the dates and rotation on Iams stock. He also checked Iams promotional displays. On one occasion he and an Iams employee reset the cat section at a superstore.

As additional evidence of the ties between NutriPet and the superstores, Falduti submitted a letter dated December 22, 1993, from Iams to NutriPet. The letter announced that exclusive distributors would receive two percent of the value of "direct sales" by Iams into the distributor's territory. The letter also stated that

[1.] Iams owns two distributors located in California and Arizona. These distributors do not play

a role in this dispute.

in determining whether to continue this "incentive program" to the distributors, Iams would examine various aspects of the distributor's relationship with the direct-buying customers, including the extent to which the distributor "developed and maintained relationships" with the direct buyers and supported their service needs by providing fill-in orders on Iams' behalf. Iams subsequently modified the incentive program to give the distributors credit rather than reimbursement for Iams' direct sales to the superstores in their territories. The purpose of this modification was to ensure that the distributors received credit toward their annual volume objectives.

### D. *Countryside's Contacts with Iams*

Falduti testified that he has suffered certain declines in business since the superstores opened in St. Louis: His annual sales of Iams products have declined from 65,164 pounds in 1991 to 5,536 pounds in 1995. His profit margin on Iams food has dropped from $7.00 to $8.00 per bag to $3.00 to $4.00 per bag. Falduti further testified that there were times when the superstores were selling Iams products at retail prices lower than his purchase price for the same product from NutriPet. Norm Worthy also testified that he was aware of retailers purchasing from PetsMart because it cost them less than to go through NutriPet.

Falduti alleges that Iams provides Pets-Mart and Pet Care with discounts in the form of lower prices, reimbursement for advertising, or giveback programs that Iams does not provide to him. Iams contests this assertion. Martin Walker testified by deposition that Iams makes cooperative advertising plans available to both the superstores and to independent retailers. Robert Schafer testified by deposition that Iams offers its customers cooperative advertising agreements under which Iams reimburses a percentage of net dollar sales so long as the product is advertised at a minimum price Iams sets. Schafer also testified that Iams provides purchasers with two percent rebates based on the retailer's volume of sales and compliance with certain merchandising criteria, such as keeping Iams' products fully stocked. Falduti states that, although other companies provide him with a co-op advertising budget, Iams has instead on occasion directly reimbursed Countryside for advertising.

Iams asserts that it has offered Falduti the opportunity to participate in every promotional campaign it has offered to the superstores. Tanya Lehrman April, former territory sales manager for Iams, testified that "truckload sales" promotions were offered to independent retailers. Steve Gaffney, former NutriPet Pet sales person, testified that all Iams promotions were offered to Falduti, but that he did not always accept the promotions. Although Falduti had successfully run "semi-truckload sales" at his original location prior to the arrival of the superstores, he declined to run any at his new location. Gaffney further testified that although other independent retailers did run truckload sales after the superstores arrived, it was not a successful strategy for them because, even at truckload prices, the independent retailers could not match the superstores' lower prices. Tanya April acknowledged in deposition that at least one of the independents was unable to sell all the volume it purchased for a truckload sale conducted during this period. Falduti testified that he declined many offered promotions because they ran simultaneously with the superstores' promotions of the same products at lower prices.

Countryside made all purchases of Iams products through a distributor. However, Iams' account representatives came to Countryside to arrange orders for promotions, clean shelves, arrange product, and check product dates. Steve Gaffney testified that Iams employees went to retail accounts such as Countryside and, among other things, checked the pricing.

### E. *The Distributorship Agreement*

Worthy testified that although NutriPet was initially an exclusive distributor for Iams, it is no longer formally designated as such. Nonetheless, other than the two-week period in which NutriPet added Ralston-Purina products, NutriPet has never sold any competitor's pet food.

The relevant clauses of the 1994 NutriPet–Iams Agreement are as follows:

1. Section 2.3 states that the decision to enter the Agreement is based in part on "Distributor's desire to sell the Products as the exclusive dog and cat food products that the Distributor offers at wholesale ... The Distributor may at any time sell any other brand of dog or cat food product at wholesale, subject to the provisions of Sections 6.1 and 6.4 of this Agreement."

2. Section 6.1 establishes that the term of the Agreement is three years, unless "the Distributor directly or indirectly distributes or undertakes to distribute or sell at wholesale any brand of dog or cat food other than the Products," in which event the Agreement expired automatically on the next anniversary of its signing.

3. Section 6.4 provides that Iams may terminate the contract for cause with thirty days written notice if NutriPet chooses to distribute competitors' pet food at wholesale. Cause includes, but is not limited to, failure to meet quarterly sales standards.

4. Section 4.1(p) requires NutriPet to give Iams thirty-days notice of a decision to distribute at wholesale any competitors' products. Section 4.1(p) also reiterates that NutriPet is free to distribute other products.

Other provisions establish NutriPet's obligations: (1) to refrain from selling Iams products to anyone the "distributor knows or has reason to believe is purchasing [Iams] for resale other than at retail to ultimate consumers," § 2.2; (2) to provide Iams with monthly reports indicating the names, addresses and quantities purchased of each ship-to customer, § 4.1(g); (3) to refrain from selling Iams to customers from outside the assigned territory, § 4.1(k); and (4) to refrain from selling to persons who are not "Qualified Retail Accounts" § 4.1(r).

Claire Levvintre, former co-owner of Bushmill, testified by affidavit and deposition that Bushmill began selling Iams products in 1978. She stated in her deposition that in 1989 Iams began to tell distributors that "exclusivity was the key word" for the upcoming contract year. Levvintre stated that as a result of Iams' coercion, Bushmill discontinued all competing dog and cat foods in 1990. She further testified that once Bushmill reached an annual sales volume of one million dollars in Iams products, Iams stated that it was in Bushmill's "best interest" to hire a sales representative. She further testified that although she made the hiring selection, Iams had the right to approve and train the salesperson Bushmill hired.

Levvintre testified that under its exclusive distributorship agreement with Iams, Bushmill was required to adhere to the suggested wholesale and retail prices Iams published as a condition of retaining its contract with Iams. Furthermore, Iams required Bushmill to add a specific surcharge to the cost of all retail sales it made of Iams' products. Levvintre further testified that Iams employees set the price Bushmill charged national accounts, commercial breeders and field trainers for Iams products, and that the price often provided Bushmill with little or no profit. Levvintre stated that Bushmill charged independent retailers approximately 15.5% above distributor's costs. Iams has moved to strike Levvintre's affidavit, arguing, among other things, that it is irrelevant because Falduti always bought from Nutri-Pet, not from Bushmill.

## F. *The Experts' Reports*

Iams and Falduti have each submitted declarations by their respective experts, the substance of which are summarized here.

Dr. Steven Schwartz, Iams' expert, describes the Iams distribution system as a dual distributorship system which necessarily divides marketing and distribution responsibilities between the manufacturer and the distributors. He further states that this system is consistent with the manufacturer's efforts to succeed in interbrand competition, and constitutes at most a form of partial downstream vertical integration. Schwartz defines the relevant market as "no larger than" the market for all canned and dry dog and cat food. He conducted his analysis based on two geographic definitions, the entire United States and the St. Louis area. Based upon these definitions, Schwartz concluded that Iams' market share in the period of 1991 to 1994 remained stable at approximately 4%. According to Schwartz, this market share is too low for Iams' distribution practices to have an anticompetitive effect.

Schwartz also concludes that any injury suffered by Countryside was "self-inflicted" in that, when Falduti changed locations in 1993, he chose to move closer to a superstore. Schwartz also notes that Falduti rejected Iams promotions and did not alter his pricing in response to competitors' prices. Finally, Schwartz concluded that Countryside was simply too small to compete with the pet superstores.

Dr. Gary French, Falduti's expert, challenges Schwartz's definition of the relevant market as including all pet foods without regard for the distinctions among the various grades of pet food. He concludes that the relevant market is the "superpremium" pet foods. Within that market, Iams has either the first- or second-largest market share.

French asserts that the superstores are responsible for much of the sales volume in the premium pet foods, and that their appearance drove retail prices down, thereby exerting pressure on Iams to lower its wholesale prices. He further contends that Iams, rather than lower costs to all its retailers, established the dual distributorship system and charged the independent retailers higher prices. This practice, he asserts, limited the extent to which the superstores increased competition. Iams' motivation in keeping prices high to the independent retailers, French states, was to maximize profits and to maintain its brand equity, which it believes is tarnished by low prices.

French concludes that Falduti has suffered an economic loss due solely to price discrimination. His most conservative estimate is that Falduti lost $15,007.00 in profits. In addition, French states, Falduti suffered other injuries due to price discrimination, including the decline in his profit margin per bag of food sold, lost sales of non-food items based on diminished ability to attract customers with low food prices, and future sales to former customers lost to new retailers.

## II. *Discussion*

In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The mov-

ing party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but must, by affidavit or other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. Summary judgment is suitable in declaratory judgment actions. *California By and Through Dep't of Water Resources v. Oroville–Wyandotte Irrigation Dist.*, 411 F.Supp. 361, 368 (E.D.Cal.1975), *aff'd*, 536 F.2d 304 (9th Cir.), *cert. denied*, 429 U.S. 922, 97 S.Ct. 320, 50 L.Ed.2d 290 (1976).

Summary procedures should be used sparingly in complex antitrust litigation. *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *In re Workers' Comp. Ins. Antitrust Litigation*, 867 F.2d 1552, 1563 n. 19 (8th Cir.), *cert. denied*, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989). However, antitrust law limits the range of permissible inferences from ambiguous evidence in a case involving § 1 of the Sherman Act. *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356–57. Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)). Where the record is clear that the antitrust claims cannot succeed, judicial administration is better served by disposition prior to trial. *Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1514–15 (7th Cir.1992).

## A. *Falduti's Counterclaim*

Falduti alleges that Iams engaged in price discrimination in violation of § 2 of the Rob-

inson–Patman Act, 15 U.S.C. §§ 13(a), (d) and (e). Specifically, Falduti alleges that Iams provides discounts to PetsMart and Pet Care, but not to him, in the form of direct discounts or reimbursements for advertising. He further alleges that the discounts are not justifiable on the basis of Iams' costs and that, as a result of the discrimination in prices, competition has been substantially injured. Falduti alleges that he has lost more than $140,000.00 per year due to the discriminatory prices and seeks treble damages under the Clayton Act, 15 U.S.C. § 15.

The Robinson–Patman Act makes it unlawful

> for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . .

15 U.S.C. § 13(a). Sections 13(d) and (e) require sellers to provide services, or compensation for services, "on proportionally equal terms" to all resale purchasers.

The purpose of the Robinson–Patman Act is "to curb and prohibit all devices by which large buyers gain[] discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). Several jurisdictional requirements must be satisfied before the courts may consider the lawfulness of pricing transactions. There must be (1) two or more sales (2) reasonably close in time (3) of commodities (4) of like grade or quality (5) with a difference in price (6) by the same seller (7) to two or more different purchasers (8) for use within the United States (9) which may result in competitive injury. A plaintiff seeking damages must also meet the actual injury requirement in 15 U.S.C. § 15. *See White Indus., Inc. v. Cessna Aircraft Co.*, 657 F.Supp. 687, 695 (W.D.Mo.1986), *aff'd*, 845 F.2d 1497 (8th Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 146, 102 L.Ed.2d 118 (1988); *see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981).

Iams argues that because Falduti purchased solely through independent distributors while the superstores purchase directly from Iams, Falduti cannot satisfy the "same seller" requirement. Falduti acknowledges that he is not a direct purchaser from Iams. However, he asserts that his claim may proceed under the "indirect purchaser" exception to the "same seller requirement" or under the analysis of § 2(d) of the Robinson–Patman Act set forth in *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

Under the indirect purchaser doctrine, one who purchases a manufacturer's goods through a distributor may be deemed to have purchased directly from the manufacturer if the manufacturer deals directly with the retailer and controls the terms upon which the purchaser buys. *Purolator Products, Inc. v. FTC*, 352 F.2d 874, 884 (7th Cir.1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968); *American News Co. v. FTC*, 300 F.2d 104, 109 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); *White Indus.*, 657 F.Supp. at 700; *Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F.Supp. 960, 966 (N.D.Ill.1982). The critical element in determining whether the indirect purchaser doctrine applies is the degree of control the manufacturer exercises over its intermediate buyer. *Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74, 84 (6th Cir.1981).

Several factors determine whether a plaintiff qualifies as an indirect purchaser, including whether the manufacturer "effectively" establishes the price paid by the indirect purchaser and whether "virtually all" of the conditions or terms of the sale are fixed by or subject to the approval of the manufacturer. *Purolator Products*, 352 F.2d at 881 (upholding FTC's finding that manufacturer engaged in price discrimination through its distribution system). Factors considered by the FTC in evaluating the direct contacts between an indirect purchaser and the manufacturer include direct negotiation of franchise agreements, direct solicitation of orders by the manufacturer's sales force even though orders are filled by the intermediary,

direct negotiations for price changes, direct policing of the indirect purchaser's resale prices, direct provision of advertising material, and inspection by the manufacturer to ensure that the indirect purchaser is complying with the terms of its agreement with the distributor. *Id.*

Iams denies that it controls the prices its independent distributors charge retailers such as Countryside. Iams points to the decisions in a similar case brought against it in the 9th Circuit in which the district court held, and the Ninth Circuit affirmed, that the plaintiff failed to establish it was an indirect purchaser. *Labrador, Inc. v. The Iams Co.,* 105 F.3d 665 (9th Cir.1997), *aff'g Labrador, Inc. v. The Iams Co.,* 1995 WL 714454 (C.D.Cal. Sept.18, 1995). The District Court in that case found that Labrador failed to establish that Iams controlled its distributors and summarized the control evidence as follows:

> Iams held joint quarterly meeting[s] with its distributors regarding the sales of Iams products, held annual sales meetings with its distributors, gave its distributors one-year distributorship contracts, conducted national promotions and contacted retail accounts along with its distributors.... The undisputed facts ... are that Iams does not dictate the retail price of its products, does not influence the sales techniques of its distributors, is not involved in developing distributors' sales policies, manuals and staff, and does not negotiate sales or prices directly with retailers.

*Labrador, Inc.,* 1995 WL 714454, at *4. Based on that evidence, the court concluded that Labrador had not established that Iams exerted the requisite control over its distributors.

■ In this case Falduti relies primarily on the testimony of Claire Levvintre to create a fact issue regarding whether Iams controls its distributors. Levvintre, a former distributor, testified that Iams effectively set the wholesale price the distributor charged the retailer, and expected the distributor to enforce the suggested retail price. She further testified that Iams required her to hire

a sales representative whom Iams then approved and trained. There is no dispute that Iams personnel periodically visited retailers and conducted, among other things, price checks. Norm Worthy, owner of Nutripet, the current distributor and the distributor from whom Countryside always purchased its Iams product, testified that Iams did not set his policies or his prices. Although Worthy told of a time some ten years ago when he believed Iams discouraged him from selling a competing product, he also testified that he discontinued that product for other reasons. Under all of the circumstances, the Court does not believe the Levvintre testimony creates a genuine issue of material fact regarding the degree of control that Iams exercises over Nutripet, from whom Countryside purchased.[2]

■ Falduti urges the Court to consider another alternative to the "same seller" requirement, based upon the Supreme Court's analysis of § 2(d) of the Robinson–Patman Act in *FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). Section 2(d) prohibits sellers from making advertising or promotional allowances available to one reselling customer but not another. 15 U.S.C. § 13(d). In *Fred Meyer,* the Court determined that a disfavored retailer who purchased through a distributor was a "customer" of a discriminating seller and did not have to satisfy the indirect purchaser test. Some district courts have applied *Fred Meyer*'s analysis to disfavored purchasers bringing § 2(a) claims. See *White Indus.,* 657 F.Supp. at 701–03; *Julius Nasso Concrete Corp. v. DIC Concrete Corp.,* 467 F.Supp. 1016 (S.D.N.Y.1979); *Checker Motors Corp. v. Chrysler Corp.,* 283 F.Supp. 876, 887 (S.D.N.Y.1968), *aff'd,* 405 F.2d 319 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Despite the appeal of the rationale set forth by the district court in *White Industries,* the Court agrees with Iams that the *Fred Meyer* exception does not apply here. Applying *Fred Meyer* as Falduti urges would effectively rewrite the law and would obviate the need for the indirect pur-

**2.** As noted above, Iams moved to strike the Levvintre affidavit. Levvintre's deposition was later taken. Although the Court will deny the motion to strike, it agrees with Iams that Levvintre's testimony is largely irrelevant, given that Nutripet, not Bushmill, is Countryside's supplier.

chaser rule. *White Industries* found persuasive the fact that the competing direct purchaser in that case had obtained its discount not by virtue of being a large quantity retailer, but "predicated upon its claimed status as a wholesaler," 657 F.Supp. at 702, a situation not present here. PetsMart and Pet Care make no pretense of being wholesalers, but rather are simply direct purchasers from Iams, unlike Countryside who made its purchases from Nutripet.

Under all the facts presented here, the Court concludes that no genuine issues of material fact remain on the issue whether Falduti can meet the "same seller" element: Falduti cannot show that he is a purchaser from Iams, and therefore Iams is entitled to judgment as a matter of law on Falduti's Robinson–Patman claims. The Court therefore need not consider whether the actual injury element is met or the other issues raised by the parties.

### B. *Iams' claims*

Iams seeks summary judgment on its claims for declaratory judgment that its dual distribution system does not violate § 1 of the Sherman Act, that it acts unilaterally in setting its prices, and that it has not engaged in a group boycott against Falduti. Falduti claims that Iams engages in vertical price and nonprice restraints resulting in anticompetitive injury. Falduti has not presented arguments or evidence in opposition to Iams' claim that it has not engaged in a group boycott. Therefore, Iams' motion for summary judgment will be granted with respect to that issue.

Falduti alleges that Iams engages in vertical price maintenance, a form of vertical price fixing in which a seller of goods attempts to set the price at which its buyer resells the goods. *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1222 (8th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988). Falduti cites the following evidence in support of his assertion that

Iams sets the price at which its distributors resell the product: (1) Levvintre testified that Bushmill was told to adhere to the suggested wholesale price, (2) she understood that adherence to the price lists was a condition of retaining the distribution agreement, (3) the distributorship agreements required the distributors to submit monthly reports containing the amounts of product sold by the distributor to each retailer, (4) Iams added a surcharge onto all retail sales made by distributors in order to match the prices charged to the superstores, and (5) in 1994, Iams introduced a direct-buying program for PetsMart that gave the superstore the option of purchasing "directly" from Iams or through the distributor at a 1% surcharge.

Falduti also alleges that Iams engages in nonprice vertical restraint and cites the following evidence in support: (1) Iams established exclusive territories for its distributors and prohibits distributors from selling outside their territories, (2) Iams asked PetsMart to refrain from making bulk sales when it learned that an independent retailer was purchasing from PetsMart rather than through Iams' distributor and (3) Iams declines to sell directly to a cooperative group of community retailers.

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. A party bringing a § 1 claim must prove (1) the existence of a contract, combination or conspiracy, (2) that produced adverse anticompetitive effects within relevant product and geographic markets,[3] (3) that the objects of the conduct pursuant to the contract or conspiracy were illegal, and (4) that the plaintiff was injured as a proximate result of the conspiracy. *Friedman v. Delaware Cty. Mem. Hosp.*, 672 F.Supp. 171, 188 (E.D.Pa.1987), *aff'd*, 849 F.2d 600 (3d Cir.1988), *aff'd*, 849 F.2d 603 (3d Cir.1988). Section 1 applies to Falduti's allegations of both vertical price and nonprice

**3.** The parties discuss at length the definition of the relevant market. As noted above, Falduti asserts that the market is all superpremium pet foods, in which Iams holds the first or second greatest share. Iams, by contrast, defines the market as all dog and cat foods, regardless of grade, in which Iams hold only a 4% share.

Much is said of cross-elasticity and low barriers to entry and other factors relevant to the determination of the relevant market. Because the Court finds that Falduti is not able to establish the requisite conspiracy or agreement, the Court need not further discuss the definition of the relevant market.

restraints. Vertical price restraints are *per se* illegal, while nonprice restraints are analyzed under the "rule of reason." *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Ryko Mfg. Co. v. Eden Services.,* 823 F.2d 1215, 1230 (8th Cir.1987). Regardless of the standard, the complaining party must show a conspiracy or agreement. *ES Dev., Inc. v. RWM Enter., Inc.,* 939 F.2d 547, 553 (8th Cir.1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992); *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n,* 666 F.2d 1130, 1138 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982).

 An antitrust party may prove the existence of a combination or conspiracy by providing direct or circumstantial evidence sufficient to warrant a finding of unity of purpose, common design or meeting of the minds. *ES Dev.,* 939 F.2d at 554. Unless an antitrust party offers evidence tending to exclude the possibility of independent action, an inference of conspiracy is unreasonable. *Pumps & Power Co. v. Southern States Indus. Inc.,* 787 F.2d 1252, 1256 (8th Cir.1986).

 Section 1 does not proscribe independent action by the manufacturer. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). A manufacturer has a right to deal or refuse to deal with whomever it likes so long as it makes that decision unilaterally. *Id.* A simple refusal to sell to suppliers who will not resell at prices suggested by the manufacturer does not satisfy the agreement requirement. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960); *Russell Stover Candies, Inc. v. FTC,* 718 F.2d 256 (8th Cir.1983). However, when the manufacturer's actions go beyond mere announcement of the policy and simple refusal to deal with noncompliant purchasers, and he employs other means to effect adherence to his required prices, he has put together a combination in violation of the Sherman Act. *Parke,*

*Davis & Co.,* 362 U.S. at 44, 80 S.Ct. at 511–12 (1960).

Thus, the question to be determined in this case is whether Iams went beyond a mere refusal to deal with noncompliant resellers.[4] The Supreme Court has found an unlawful combination in the following circumstances: a pharmaceutical manufacturer involved its wholesalers to stop the flow of its products to noncompliant retailers, *Parke–Davis,* 362 U.S. at 45, 80 S.Ct. at 512; a manufacturer instituted a system of reporting in order to cut off noncompliant retailers who were then reinstated only upon giving assurances that they would maintain prices in the future, *FTC v. Beech–Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); a manufacturer's wholesalers cooperated in price setting and engaged in approval of retail licensees, *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 723, 64 S.Ct. 805, 813–14, 88 L.Ed. 1024 (1944).

 Falduti does not argue that any distributor was terminated for refusing to follow Iams' pricing plans. Although the distributorship agreements arguably required distributors to sell only within their restricted territories to approved retailers who followed approved price schedules, there is no evidence that Iams ever terminated a distributor for failing to follow these guidelines. Similarly, there is no evidence that Iams ever asked a distributor to refrain from selling to a retailer who did not follow suggested pricing.

Falduti's theory of Iams' motivation in establishing its dual distribution system, as presented through his expert Dr. French, is that the superstores wield such market power that they can exert a backward pressure on the manufacturers to supply them at lower-than-optimal costs. According to this theory, Iams declines to pass the reduced costs on to the independent retailers who carry its products because it wishes to (1) maximize profits by charging more to a subsection of its market and (2) maintain its "brand-equity" with consumers by charging superpremium prices commensurate with its superpre-

---

4. The Court notes that Iams presented evidence, which Falduti does not dispute, that no distributor was ever terminated for failure to adhere to the suggested prices.

**1274**

mium image. The Court takes no position on this theory, but notes only that Falduti has not presented evidence that supports this theory or that tends to exclude the possibility that Iams was acting independently in its dealings with its distributors.

Because Falduti cannot satisfy the critical element of combination, required to maintain a Sherman Act § 1 action, Iams' motion for summary judgment will be granted with respect to that claim.

Accordingly,

**IT IS HEREBY ORDERED** that Iams' motion for summary judgment on Falduti's counterclaim [# 29] is granted.

**IT IS FURTHER ORDERED** that Iams' motion for summary judgment on its claim for declaratory judgment [# 36] is granted.

**IT IS FURTHER ORDERED** that Iams' motion to strike Claire Levvintre's affidavit [# 40] is denied.

A separate judgment in accord with this amended memorandum and order was entered and became final on May 6, 1997.